**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**July 5, 2017**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

DAKOTA LANE WILLISTON,

    Defendant - Appellant.

No. 15-7080

_____

**Appeal from the United States District Court**
**for the Eastern District of Oklahoma**
**(D.C. No. 6:14-CR-00085-RAW-1)**
_____

Robert A. Ridenour, Assistant Federal Public Defender (Barry L. Derryberry, Research and Writing Specialist, and Julia L. OP'Connell, Federal Public Defender, with him on the briefs), Office of the Federal Public Defender, Northern & Eastern Districts of Oklahoma, Tulsa, Oklahoma, for Defendant-Appellant.

Linda A. Epperley, Assistant United States Attorney (Mark F. Green, United States Attorney, and Gregory Dean Burris, Assistant United States Attorney, with her on the brief), Office of the United States Attorney, Muskogee, Oklahoma, for Plaintiff-Appellee.
_____

Before **BRISCOE**, **MATHESON**, and **PHILLIPS**, Circuit Judges.
_____

**PHILLIPS**, Circuit Judge.
_____

The grand jury is a constitutionally mandated body that both protects the rights

of defendants and provides a powerful investigative tool for federal law enforcement.

A key part of the grand jury's investigative power is its ability to compel testimony, subject to witnesses' Fifth Amendment rights against self-incrimination. Grand-jury witnesses have no right to *Miranda* warnings, nor do they have an absolute right to remain silent—even witnesses implicated in the criminal activities that the grand jury is investigating. *United States v. Mandujano*, 425 U.S. 564, 579-80 (1976) (plurality opinion). Here, the Defendant argues that *Miranda* should apply to protect grand-jury targets who are confined on unrelated criminal charges. From this, the Defendant argues that the district court erred at trial by not suppressing his grand-jury testimony, because the government failed to provide him *Miranda* warnings before that testimony. We reject this argument. We hold that the rule rendering *Miranda* inapplicable to grand-jury witnesses extends to persons who are incarcerated for unrelated reasons when they are subpoenaed to appear before a grand jury. We also reject the Defendant's other challenges to his conviction and sentence—challenges based on the Sixth Amendment right to counsel, unfairly prejudicial evidence, the evidentiary rule of completeness, and the Eighth Amendment's prohibition on cruel and unusual punishment. We affirm on all grounds.

I

On June 3, 2014, an FBI agent served a grand-jury subpoena on Dakota Lane Williston in the McCurtain County Jail in Idabel, Oklahoma. Williston was being held in the jail on state charges unrelated to the crime that the grand jury was investigating. The FBI agent also handed Williston a target letter from the United States Attorney's Office and a blank financial affidavit. The target letter had a

2

heading of "Advice of Rights" and informed Williston that he was the target of a federal grand jury murder investigation. R. vol. 1 at 109-10. The letter also advised Williston that he could "refuse to answer any question if a truthful answer to the question would tend to incriminate you"; that anything Williston did or said "may be used against you by the Grand Jury or in a subsequent legal proceeding"; that Williston could step outside the grand-jury room to consult with retained counsel, if he had any; and that if Williston had not retained counsel "and cannot afford to hire counsel, a financial affidavit is attached." *Id.* at 126. The letter stated that the completed financial form could be returned to "the Federal Public Defender's Office" in Muskogee, Oklahoma. *Id.* The FBI agent read the target letter verbatim to Williston and reiterated that Williston was the target of the investigation. The government secured an Order for Writ of Habeas Corpus Ad Testificandum for Williston and United States Marshals transported him to the Muskogee County Jail for his grand-jury testimony. Another FBI agent met with Williston before his grand-jury appearance to ask if Williston would be testifying—to avoid bringing Williston in front of the grand jury for the sole purpose of hearing him invoke his Fifth Amendment rights. Williston said that he would be testifying.

On June 11, 2014, Williston appeared before the grand jury. Before the federal prosecutor began asking Williston any questions, he reviewed on the record Williston's rights with him. First, the prosecutor confirmed that Williston had received and understood the target letter. Then he reviewed the target letter with Williston, informing him that the grand jury was investigating a murder in Indian

3

Country. He advised Williston that he could "refuse to answer any question if the truthful answer to the question would tend to incriminate you." Supp. R. vol. 5 at 19. He told Williston that anything Williston said could be used against him "by the grand jury or in a subsequent legal proceeding." *Id.* The prosecutor then said that if Williston had retained counsel, he could consult with counsel outside the grand-jury room. He added that:

> I would also inform you, as I see that you're in custody on some charges, that you have the right to counsel at no expense to you. We can have that appointed to you at no expense should you feel like you want counsel at any time. And you have the right to remain silent in that regard as well.

*Id.*[1]

Williston affirmed that he understood all that information. The prosecutor then moved on to his substantive questions, starting out by asking if what he had heard was true—that Williston wanted to tell the grand jury his story? Williston answered "Yes, sir." *Id.* at 20. The prosecutor's belief stemmed from Williston's prior affirmation to the second FBI agent that he planned to testify rather than invoke his Fifth Amendment rights. Williston then gave his account of the death of Payton Cockrell, some of which is set out below as introduced through an FBI agent at trial.

On July 23, 2013, Williston was living in his grandmother's house in Idabel, a town in southeastern Oklahoma. Earlier that month, two persons had moved in with

---

[1] Williston had not filled out the financial affidavit form that the FBI agent provided him while in the McCurtain County Jail, which would have begun the process of obtaining appointed counsel.

4

Williston: Brittany Cockrell, a woman with whom Williston was personally involved, and Brittany's two-and-a-half-year-old daughter, Payton. Williston told the grand jury that, on the morning of July 23, he woke up as Brittany was preparing to go to work. When Brittany started to leave the house soon before 10 a.m., Payton attempted to follow her mother out the door. Williston told Brittany to leave Payton at home with him that day, rather than take Payton to day care, so that Brittany would have a reason to come home sooner.

After Brittany had left for work, Williston told the child, who was crying, to go lie down on her bed, which she did. Williston went back to sleep. When he awoke again, he stripped the sheets from his bed and from Payton's bed, took them to the laundry room along with towels that he said Payton had thrown up on during the night, retrieved the house's landline phone to see if anyone had called, and then lay down on his bed. When Williston stripped the sheets from Payton's bed, he told the grand jury that Payton woke up for a moment, said "nite-nite," and went back to sleep. R. vol. 2 at 1533.

When Williston got out of bed again soon afterward, he began preparing to take a shower and "hollered at Payton a couple of times." *Id.* at 1496. When Payton didn't respond, Williston said that he shook her a few times to try to wake her up, but that she still didn't respond. Williston told the grand jury that he then "started freaking out," "patted" Payton on the cheek, and accidentally "busted her lip," causing blood to trickle across her teeth. *Id.* at 1497-98. Apart from a bruise on Payton's face that he said was accidentally caused by Brittany when brushing

5

Payton's hair the night before, Williston said that the busted lip was the only injury he could see on Payton. Williston testified that he then put Payton on the floor and ran to get his grandmother, who had entered the house soon before.

At 12:10:59 p.m., Williston called Brittany. He asked only when Brittany would be coming home. At 12:11:48 p.m., Williston called Brittany again and told her that he couldn't wake up Payton. The woman that Brittany was caring for as a home-health aid overheard the conversation and immediately called the police. At 12:16 p.m., Williston called 911. Emergency-services personnel arrived at 12:22 p.m. and took Payton to the hospital, where she was pronounced dead. Williston approached one of the responding sheriff's deputies, whom he knew, and said, " . . . what do I do? Tell me what to do." *Id.* at 510. He also told the deputy that he had made Payton lie down, and then started shaking and slapping her when she wouldn't wake up. Williston told the grand jury that, from the time Brittany left the house until he found Payton unresponsive, he was the only one in the room with her, that he had no reason to believe that Payton had left the room while he was asleep, and that he didn't believe anyone had snuck into the house and hurt Payton.

Later trial testimony from emergency-services personnel and other medical witnesses painted a far more severe picture of Payton's injuries than Williston had described. Emergency-services personnel noticed dried blood and several bruises on her face. At the hospital emergency room, medical personnel observed extensive, visible injuries to Payton's neck, head, face, chest, mid-back, and other areas.

6

A search of the house revealed blood containing Payton's DNA in multiple locations in Williston's room, including a blood spatter on the wall, as well as on towels in the laundry room. The pathologist at the medical examiner's office ruled Payton's death a homicide caused by blunt force injuries to the head and torso, documenting both serious head injuries and massive internal injuries, either of which would have been enough to cause Payton's death independently. Payton suffered the majority of her injuries within a few days of her death. Payton's abdominal wall—which encloses the intestines—was also bruised, which a child-abuse expert attributed to especially severe trauma. The expert also testified that her medical diagnosis of the cause of Payton's death was severe child abuse.

On December 19, 2014, six months after Williston's testimony, the grand jury indicted Williston for Payton's murder. Williston filed a pretrial motion to suppress his grand-jury testimony. A magistrate judge recommended the denial of the motion, and the district court adopted the recommendation and denied the motion. After a seven-day trial, during which an FBI agent read portions of the transcript of Williston's grand-jury testimony into the record, a jury convicted Williston of first-degree murder in Indian Country committed during the perpetration of child abuse, in violation of 18 U.S.C. §§ 1111, 1151, and 1153.[2] The district court sentenced Williston to life without parole, as mandated by 18 U.S.C. § 3559(d). Williston now

_____

[2] At trial, the government called 38 witnesses and presented 102 exhibits; the defense called one witness and presented four exhibits. The jury deliberated for just under 3½ hours.

7

appeals, raising issues concerning his Fifth and Sixth Amendment rights, evidentiary

rulings, and sentencing.

## II

Williston argues that the government violated his Fifth Amendment rights by

not providing him a *Miranda* warning before his grand-jury testimony. Williston

acknowledges that the Supreme Court held in *Mandujano* that the full warnings of

*Miranda v. Arizona*, 384 U.S. 436 (1966)—including the warning that a defendant

has an absolute right to remain silent[3]—required for custodial interrogation need not

be given to grand-jury witnesses, even if they are testifying about criminal activity in

which they may be implicated. *Mandujano*, 425 U.S. at 579-80. Williston

distinguishes his case from *Mandujano* by pointing out that he was in state custody at

the time of his grand-jury appearance. Thus, he argues, the circumstances of his

questioning made him not merely a grand-jury witness, but a person in custody being

interrogated. By his telling, federal marshals involuntarily transported him to the

---

[3] For a full *Miranda* warning,

> the following measures are required. [The individual being questioned
> in custody] must be warned prior to any questioning that he has the right
> to remain silent, that anything he says can be used against him in a court
> of law, that he has the right to the presence of an attorney, and that if he
> cannot afford an attorney one will be appointed for him prior to any
> questioning if he so desires.

*Miranda*, 384 U.S. at 479. Of those four parts, Williston received only the latter three
and so did not receive a full *Miranda* warning. Furthermore, Williston was told,
properly, that if he did have an attorney, he could consult with him only outside the
grand-jury room. *See Mandujano*, 425 U.S. at 581.

grand jury, left him handcuffed and shackled during questioning, and subjected him to questioners able to charge him with a crime, all while knowing that Williston, a "putative defendant," Appellant Br. at 23, was likely to incriminate himself, as an 18-year old with limited education far from his home and family.[4]

In reviewing a motion-to-suppress ruling based on the applicability of *Miranda*, we review de novo the ultimate question of whether *Miranda* applies. *United States v. Jones*, 523 F.3d 1235, 1239 (10th Cir. 2008). But we accept the district court's factual findings unless they are clearly erroneous, and we view the evidence in the light most favorable to the party that prevailed at the district court—here, the government. *Id.*

"The grand jury is an integral part of our constitutional heritage which was brought to this country with the common law." *Mandujano*, 425 U.S. at 571; *see* U.S. Const. amend. V. The grand jury functions as both a shield and a sword. "Its historic office has been to provide a shield against arbitrary or oppressive action, by insuring that serious criminal accusations will be brought only upon the considered judgment of a representative body of citizens acting under oath and under judicial instruction and guidance." *Mandujano*, 425 U.S. at 571. The law also "vests the grand jury with

---

[4] Williston's grand-jury testimony was hardly the only statement he made about Payton's death. The day of the murder, Williston made a voluntary, oral statement to a responding sheriff's deputy and a written statement to the Choctaw Nation Tribal Police, describing his actions that morning. He also spoke at length, after receiving a *Miranda* warning, to investigators, and gave an interview to a local newspaper.

9

substantial powers, because '(t)he grand jury's investigative power must be broad if its public responsibility is adequately to be discharged.'" *Id.* (alteration in original) (quoting *United States v. Calandra*, 414 U.S. 338, 344 (1974)). "Indispensable to the exercise of its power is the authority to compel the attendance and the testimony of witnesses . . . ." *Id.* Grand-jury subpoenas mandate a person's appearance, and once present, "witnesses are thus legally bound to give testimony." *Id.* at 572.

But the Fifth Amendment does set a limit on the grand jury's investigative mandate. "No person . . . shall be compelled in any criminal case to be a witness against himself . . . ." U.S. Const. amend. V. The Supreme Court has long recognized that this protection covers testimony before a grand jury. *Counselman v. Hitchcock*, 142 U.S. 547, 586 (1892), *overruled on other grounds by Kastigar v. United States*, 406 U.S. 441 (1972). The government's treatment of Williston during its investigation of Payton Cockrell's murder more than complied with this protection. Government representatives warned him three times that he could refuse to answer any grand-jury question if he felt the answer would incriminate him—once in the target letter, again in the FBI agent's verbatim reading of the target letter, and finally in the prosecutor's oral warning before asking substantive questions.

But Williston wants something more. He wants us to require the prosecutor to have warned him, per *Miranda*, that he had "a right to remain silent." 384 U.S. at 444. The two warnings have similarities, but their legal and practical consequences vastly differ. "Probing questions to all types of witnesses is the stuff that grand jury investigations are made of; the grand jury's mission is, after all, to determine whether

10

to make a presentment or return an indictment." *Mandujano*, 425 U.S. at 573. Not all such witnesses will be upstanding citizens. "It is in keeping with the grand jury's historic function as a shield against arbitrary accusations to call before it persons suspected of criminal activity, so that the investigation can be complete." *Id.* Many of those persons, especially those "able to illuminate the shadowy precincts of corruption and crime," *id.*, will likely be in custody because of other offenses. The warning against self-incrimination, which Williston received, allows grand juries to do their essential investigative work while still notifying the person being questioned of his Fifth Amendment rights.

A full *Miranda* warning, on the other hand, would destroy a key part of the grand jury's investigative power. Witnesses who happen to be in custody for unrelated reasons could refuse to answer any grand-jury questions, whether about themselves or other criminal activities. This absolute right to remain silent, for the witnesses often best positioned to offer valuable information, would hobble the grand jury's ability to get to the bottom of crimes, both to prosecute the guilty and protect the innocent.

Furthermore, a full-*Miranda*-warning requirement would run counter to the Supreme Court's direction that grand-jury witnesses are not in custody while testifying, and that grand-jury questioning is not interrogation. The *Mandujano* plurality found that *Miranda* "simply did not perceive judicial inquiries and custodial interrogation as equivalents." *Id.* at 579. Questioning in a grand-jury room does not implicate the types of coercion that *Miranda* sought to remedy. *Id.* at 580.

11

Williston's sole hope, then, depends upon his already having been in unrelated custody at the time when he was brought in for questioning. But that circumstance does not warrant a departure from *Mandujano*'s holding. Even though Williston said that he wanted to tell the grand jury his story, his appearance before the grand jury was technically involuntary—a subpoena mandated his presence. But subpoenas are routine for grand-jury witnesses, whether in custody or not. So when Williston argues that the grand-jury room was a hostile environment based on how the government "ensured Williston's presence . . . and all but guaranteed his testimony," he is arguing against the grand-jury system itself, not any facts specific to his situation. Appellant Br. at 21.

Nor do we conclude that the specific restrictions Williston was subjected to in this case—his wearing handcuffs and shackles and his being escorted by federal marshals—changed his grand-jury questioning into custodial interrogation. In *Howes v. Fields*, 565 U.S. 499 (2012), the Supreme Court found that law-enforcement officers questioning an inmate in a private room inside a prison does not automatically amount to custodial interrogation under *Miranda*. The facts of *Howes* differ from those here—in *Howes*, the prisoner was questioned by officers in a prison conference room, not in front of a grand jury, *id.* at 502-03—but its principles apply nearly as well. The Court rejected as unsound the Sixth Circuit's categorical rule that any private questioning of an imprisoned person about events in the outside world requires *Miranda* warnings. *Id.* at 508-12. The Court noted that questioning a prisoner "may necessitate some additional limitations on [the prisoner's] freedom of

12

movement." *Id.* at 513. Prisoners might be taken under guard to their interview room, among other special security measures, but "such procedures are an ordinary and familiar attribute of life behind bars." *Id.* Thus, such "standard conditions of confinement and associated restrictions on freedom will not necessarily implicate the same interests that the Court sought to protect when it afforded special safeguards to persons subjected to custodial interrogation." *Id.* at 512. Similarly, Williston's treatment in this case is best characterized as embodying the formalities of transporting and securing a prisoner in any location, not as a special trigger for *Miranda*.

Neither of the cases Williston cites as support for his argument that grand-jury witnesses in his position are entitled to full *Miranda* warnings actually help him. The first, *Stanley v. United States*, 245 F.2d 427, 434 (6th Cir. 1957), was decided nine years before *Miranda*, and so could hardly have been referring to *Miranda* warnings when it discussed the protections that should be afforded "to a witness who is virtually in the position of a defendant." In fact, the second case that Williston cites, *United States v. Fromin*, 540 F.2d 846, 848-49 (6th Cir. 1976), makes that clear. *Fromin* applied *Stanley*'s rule that putative defendants in front of a grand jury should receive the protections afforded actual defendants—but noted that the protection at issue was a warning about a right not to self-incriminate (which Williston received), not the broader *Miranda* right to remain completely silent (which he did not). *Id.* The Sixth Circuit noted explicitly that "[h]ere we are not concerned with Miranda warnings." *Id.* at 849. And in *Mandujano*, the Supreme Court overruled a Fifth

13

Circuit opinion that had approvingly cited *Stanley* and other Sixth Circuit cases that Williston relies on as supporting the rule that he now seeks. *See United States v. Mandujano*, 496 F.2d 1050, 1054 (5th Cir. 1974), *overruled by Mandujano*, 425 U.S. at 584. In other words, either the Sixth Circuit never established the expansive *Miranda* rule that Williston wants, or it did and the Supreme Court rejected it.

Grand juries have a duty to question a range of witnesses, including some involved in criminal activities. "The Court has never ignored this reality of law enforcement." *Mandujano*, 425 U.S. at 573. We will not alter course and endorse an "extravagant expansion" of *Miranda*, *id.* at 580, simply because a witness and target is in custody for an unrelated reason.[5] Williston was not entitled to a *Miranda* warning before his grand-jury questioning, and we affirm the denial of his motion to suppress.

### III

Williston's Sixth Amendment argument for suppression of his testimony—that he was required to have a lawyer at the time of his grand-jury appearance—hinges on his alleged status as a de facto defendant at that time, even though he had not yet been charged with any federal crime. In fact, he was not charged with a crime until more than six months after his testimony. The Sixth Amendment provides that a defendant "shall enjoy the right . . . to have the Assistance of Counsel for his

---

[5] Because we find that the prosecutor need not have given Williston a full *Miranda* warning, we need not address Williston's preemptive argument that he did not validly waive his *Miranda* rights.

14

defence." U.S. Const. amend. VI. That right to counsel mandates the presence of counsel for a defendant at certain critical stages of the legal proceedings against him—but it does not attach until adversarial proceedings begin. *United States v. Gouveia*, 467 U.S. 180, 187-88 (1984); *United States v. Toles*, 297 F.3d 959, 965 (10th Cir. 2002). The initiation of adversarial proceedings is triggered by a formal charging event, such as an indictment, an information, an arraignment, or a preliminary hearing. *Gouveia*, 467 U.S. at 188. Williston can cite no legal precedent that places grand-jury questioning in this category.

And for good reason: grand juries are investigative, not adversarial, bodies. *See Mandujano*, 425 U.S. at 571-72. Though Williston was labeled as the target of the investigation, part of the reason the grand jury demanded his presence was to ascertain whether that target status was warranted and whether adversarial proceedings should be initiated—in other words, to give Williston the chance to "tell the grand jury [his] story." Supp. R. vol. 5 at 20. None of the circumstances that Williston describes—his young age, his limited education, a possibly confusing colloquy by the grand-jury prosecutor about the right to counsel—alter the rule that the Sixth Amendment right to counsel attaches only when adversarial proceedings commence. And the Sixth Amendment right to counsel is offense-specific, so Williston's detention on an unrelated state charge did not trigger a right to counsel

15

when he was questioned by a federal grand jury.[6] *See Toles*, 297 F.3d at 965 ("The Sixth Amendment right to counsel . . . is offense-specific and does not prevent law enforcement from questioning a defendant about unrelated or uncharged criminal activity."). Williston's Sixth Amendment rights were not violated, and we affirm the denial of his motion to suppress.

IV

Before Williston's trial, the government filed a Fed. R. Evid. 404(b) notice that it intended to introduce evidence of other acts that Williston committed on and toward Payton. Rule 404(b) allows evidence of other crimes, wrongs, or acts to prove a defendant's "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident"—but not to prove a defendant's character or criminal propensity. The government's notice stated that family friend Ashley Hamilton would testify that she witnessed Williston spank Payton when the child would not stop crying, that the spanking was "over the top," and that Williston would get "very upset and stressed out when Payton cried." R. vol. 1 at 182. The notice also stated that Williston's cousin, Katie Mejardo, who had lived with Williston, Brittany, and Payton, would testify that she saw Williston throw Payton into her car seat, causing her to strike her head on the back of the seat, that Williston took his anger

_____

[6] We again note that Williston had every opportunity to obtain a lawyer before his grand-jury testimony thanks to the financial affidavit provided to him, but he did not do so.

16

out on Payton and hated when she cried, and that he had said, "Just let me hit her once." *Id.* at 183.

Williston filed a Motion in Limine, asking the district court to exclude any mention of his "disciplining or being mean to the child victim." *Id.* at 53. In a pretrial order, the district court stated that it was leaning toward admitting these pieces of evidence, because of their relevance to "possible resentment by the defendant" and "possible escalation of response." *Id.* at 250. The court added that motive would likely be the permissible basis for admission of the evidence. Ultimately, the court decided to hold the Motion in Limine under advisement.

At trial, the government called Hamilton and Mejardo to testify. The district court overruled defense objections based on Fed. R. Evid. 403 and 404(b). The district court allowed Mejardo to testify that Williston would yell at Payton if he was in a bad mood, that when Payton cried he would sometimes hit her or make her sit in her room and not let anyone else into the room, that he once threw Payton into her car seat—causing her head to hit the back of the seat—and then threw her cup at her, and that she agreed that it was not unusual for Williston to lash out at Payton. Overruling similar defense objections, the district court allowed Hamilton to testify that she had seen Williston "whoop" Payton and agreed that the "whooping" was at least "a little bit over the top." R. vol. 2 at 1050, 1059. Before deliberations, the district court instructed the jury about "Other Acts," stating that "You have heard evidence of other acts engaged in by the defendant. You may consider that evidence only as it bears on the defendant's motive and for no other purpose." R. vol. 1 at 617.

17

Williston now argues that the district court erred in allowing that testimony because it showed Williston's bad character and propensity to act in a certain way, rather than his motive. The acts that Hamilton and Mejardo testified to, Williston argues, were not crimes under Oklahoma law and were not similar enough to the acts that caused Payton's death to justify admission. We review a district court's 404(b) evidentiary rulings for abuse of discretion. *United States v. Moran*, 503 F.3d 1135, 1143 (10th Cir. 2007). So long as a district court's 404(b) ruling is within the bounds of permissible choice given the circumstances, and is not arbitrary, capricious, or whimsical, we will affirm. *Id.*

To admit 404(b) evidence, a district court must find that the evidence is being offered for a proper purpose, that the evidence is relevant to that purpose, and that—under Rule 403—the probative value of the evidence is not substantially outweighed by the potential for unfair prejudice. *United States v. Huddleston*, 485 U.S. 681, 691 (1988). And when asked to do so, the district court should instruct the jury to consider the 404(b) evidence for only the specific, proper purpose for which it was admitted. *Id.* at 691-92. Rule 404(b) evidence can be admissible "even though it has 'the potential impermissible side effect of allowing the jury to infer criminal propensity.' . . . That is, such evidence may be admissible under Rule 404(b) as long as it tends to prove something other than criminal propensity." *Moran*, 503 F.3d at 1145 (quoting *United States v. Cherry*, 433 F.3d 698, 701 n.3 (10th Cir. 2005)). We have held that Rule 404(b) is a rule of inclusion, and we regularly affirm the

18

admission of other-acts evidence unless it tends to prove only a criminal propensity. *United States v. Watson*, 766 F.3d 1219, 1235 (10th Cir. 2014).

The testimony of Hamilton and Mejardo did tend to prove something other than criminal propensity: motive. In *United States v. Mills*, 82 F.3d 427 (10th Cir. 1996) (unpublished table decision), a defendant was charged with child abuse. He objected to the admission of photographs that showed past bruising of the child victim. *Id.* at *2. We concluded that the district court had properly admitted the photographs for several permissible 404(b) purposes, including motive. *Id.* The photographs could demonstrate the defendant's "animosity" toward the victim, "which he expressed through physical abuse." *Id.* We find *Mills* persuasive for this case. The testimony about Williston's harsh, physical disciplining of and anger toward Payton—even if, unlike in *Mills*, all the past action might not have been a crime—could be viewed as relevant in establishing that Williston had a motive for harming Payton: animosity or, as the district court put it, "resentment." R. vol. 1 at 250. The blows that caused Payton's death were obviously far more serious than those that Hamilton and Mejardo witnessed Williston perform. But the jury could have viewed their nature—lashing out at and striking a specific child in anger—as fundamentally the same and in line with a common motive.

Evidence of Williston's violent acts against others may come closer to the impermissible-purpose line. The district court thought as much, which is why it excluded evidence of Williston's physical violence toward Brittany and another

woman with whom he was involved.[7] But a defendant's history of physically striking a particular child in anger could show the resentment and anger that would help a jury comprehend the "reasons" a man would beat to death the defenseless child of his romantic partner.[8] Thus, the district court acted within its discretion in admitting the testimony of Hamilton and Mejardo to prove motive.

The district court also acted within its discretion in determining under Rule 403 that this testimony's probative value was not substantially outweighed by the danger of any unfair prejudice. Here, the probative value was substantial: establishing a possible motive for why Williston would commit such a heinous crime. And finally, the district court did issue a limiting instruction to the jury instructing it to consider the testimony only for the purpose of motive.

Williston's attempt to draw an analogy to our exclusion of 404(b) evidence in *United States v. Edwards*, 540 F.3d 1156 (10th Cir. 2008) avails him nothing. In *Edwards*, we found that evidence of the defendant's prior possession of personal-use

---

[7] That woman is the mother of Williston's two children.

[8] Neither party made the following argument, so we do not fully address it, but we note that Williston's history of striking Payton in anger may have been admissible as intrinsic evidence of Williston's alleged crime. *See United States v. Parker*, 553 F.3d 1309, 1314 (10th Cir. 2009) ("[i]ntrinsic evidence is directly connected to the factual circumstances of the crime and provides contextual or background information to the jury." (alteration in original) (quoting Thomas M. DiBiagio, *Intrinsic and Extrinsic Evidence in Federal Criminal Trials: Is the Admission of Collateral Other-Crimes Evidence Disconnected to the Fundamental Right to a Fair Trial*, 47 Syracuse L. Rev. 1229, 1231 (1997))); *United States v. Record*, 873 F.2d 1363, 1372 n.5 (10th Cir. 1989) (noting that Rule 404(b) applies only to extrinsic acts, which do not include acts that are part of the scheme for which the defendant is being prosecuted or which are inextricably intertwined with the charged crime).

20

amounts of drugs was inadmissible under 404(b) to help prove his distribution of drugs, given the dissimilar nature between possessing and distributing drugs and the government's vague, overly broad justifications for the evidence. *Id.* at 1163-64. Williston argues that the 404(b) testimony against him was analogous: his "acts of discipline or rough treatment of Payton" were too dissimilar to "the extreme acts of abuse that led to Payton's death" to justify admission. Appellant Br. at 34.

We disagree. In *Edwards*, we took exception to the government's under-explained, blanket assertion that drug-use evidence was permissible to establish a wide range of 404(b) purposes—including some not in dispute—in a trial for drug distribution. 540 F.3d at 1163-64. But the distance between using drugs and distributing them is greater than the distance between striking a particular child in anger and striking that same child in anger causing death. And factual similarities aside, the primary distinction from *Edwards* is that here, the government's evidence was restricted to one narrow purpose—motive—that the disputed issue of the identity of the murderer made a relevant trial issue.[9] The district court did not abuse its

---

[9] That distinction also saps the force of Williston's citations to *United States v. Comanche*, 577 F.3d 1261 (10th Cir. 2009). In *Comanche*, we found that admission of a defendant's convictions for aggravated battery was not proper under 404(b) when the only purpose was to demonstrate the defendant's intent to commit assault rather than to act in self-defense. *Id.* at 1268-69. Because the defendant's only defense was self-defense, the only way that his prior convictions could have helped establish intent was to improperly convince the jury that he was generally a violent person. *Id.* Here, in contrast, the testimony of Williston's other acts helped establish his motive to commit violence against one specific child, not a general propensity for violence.

21

discretion in admitting the testimony of Hamilton and Mejardo as to Williston's other acts toward Payton.

V

On the day of Payton's murder, investigators from Oklahoma, the Choctaw Nation, and the FBI interviewed Williston at the Idabel police station after reading him his *Miranda* rights. Before trial, the government gave the district court and the defense a videotape of the interview, along with timestamps of the segments that it intended to introduce at trial. From the interview's roughly 90 minutes, the government sought to introduce about 24 minutes, in segments varying from as long as several minutes to as brief as seven seconds. The defense made no pretrial objections.

During the trial, Williston's counsel objected to the introduction of the video segments that the government had selected and asked that additional segments be admitted. The additional segments featured Williston, telling investigators that he had seen some blood coming out of Payton's mouth, that he believed child abuse to be wrong and didn't like to see children hurt, and that he was hit as a child and wouldn't hit his own children, whom he spoke about "glowingly." R. vol. 2 at 1270. The district court offered to allow the entire interrogation video to be played for the jury, but defense counsel declined because he said that the full video included prejudicial statements. The district court overruled Williston's objection to the government-edited videotape of the interrogation and the jury saw only that version.

22

During cross-examination of an FBI agent who helped conduct the videotaped, voluntary interview of Williston on the day of the murder, defense counsel tried, with limited success, to elicit answers about parts of the video that had not been admitted into evidence. Defense counsel, over government objection, was able to ask whether the agent remembered Williston crying when he talked about the ambulance arriving to take away Payton. When the agent said he couldn't remember, defense counsel, again over government objection, was able to ask him: "So if I were to stand here and tell you in open court in front of this jury that my client cried at that portion [of the videotape], do you have any reason to doubt that?" R. vol. 2 at 1449-50. That line of questioning elicited an answer of "I don't guess so," from the agent. *Id.* at 1450. The government successfully objected to defense counsel's other efforts to ask questions about the portions of the videotape in which Williston talks about his views on disciplining children, his own children, his own beatings as a child, and his denials of killing Payton.

During defense counsel's closing argument, counsel referenced the interrogation video and noted that "there were portions that I had to drag out of [the FBI agent] that aren't on the recording. Do you remember that, folks? Please remember that." *Id.* at 1671. He then stated that Williston "was crying in grief over the death of Payton Cockrell and what had happened and how he found her." *Id.* at 1672. Counsel added that Williston's crying was a "crucial time when that young man shows sorrow, when he shows pain and suffering and sadness" that had been "taken out" of the video. *Id.* He concluded that part of his argument by asking the

23

jury: "Is it fair?" *Id.* In the government's rebuttal closing argument, the prosecutor

argued that Williston's reactions during his interview were unnatural. He stated:

"Look how calm, cool and collected he was in that video that you watched. . . . How

upset did he appear in that video . . . ? . . . There was no showing of grief over that

baby." *Id.* at 1707-08. During the jury's deliberations, the only piece of evidence it

asked to review was the government-excerpted interrogation videotape.

Williston argues that either the government's excerpted version of the

interrogation video should not have been admitted, or that his preferred segments of

the video should also have been admitted. By allowing in only the government-

excerpted video, Williston argues, the district court violated Fed. R. Evid. 106, often

referred to as the rule of completeness, which provides, "If a party introduces all or

part of a writing or recorded statement, an adverse party may require the

introduction, at that time, of any other part—or any other writing or recorded

statement—that in fairness ought to be considered at the same time." And because

Williston's counsel was not able to fully cross-examine the FBI agent about the

unadmitted portions of the tape, Williston argues that the district court also violated

his Sixth Amendment right to confront the witnesses against him. *See* U.S. Const.

amend. VI. We review evidentiary rulings by the district court for abuse of

discretion, meaning that we do not reverse absent a distinct showing that the district

court ruled based on a clearly erroneous finding of fact or conclusion of law or

manifested a clear error of judgment. *United States v. Batton*, 602 F.3d 1191, 1196

(10th Cir. 2010).

The rule of completeness, which began as a common-law rule and is now partially codified in Rule 106, does not give an interview declarant a general right to introduce selected statements to try to counter the statements in the proponent's offered segment. Fed. R. Evid. 106. Instead, the rule "functions as a defensive shield against potentially misleading evidence proffered by an opposing party." *Echo Acceptance Corp. v. Household Retail Servs., Inc.*, 267 F.3d 1068, 1089 (10th Cir. 2001). Only the portions of a statement that are relevant to an issue in the case and necessary to explain or clarify the already-admitted portions need be admitted. *United States v. Lopez-Medina*, 596 F.3d 716, 735 (10th Cir. 2010). The four factors to consider are whether the statement or statement portion that a party seeks to admit under the rule of completeness (1) explains the admitted evidence, (2) puts the admitted evidence in context, (3) does not itself mislead the jury, and (4) ensures that the jury can fairly and impartially understand the evidence. *Id.* Hearsay statements that do not meet this test remain inadmissible. *See id.*

Nor is there a violation of the Sixth Amendment's Confrontation Clause when a defendant is prevented from using his own inadmissible hearsay statements to cross-examine a witness, because such a maneuver would amount to "an end-run around the adversarial process." *United States v. Larsen*, 175 F. App'x 236, 242 (10th Cir. 2006) (unpublished) (quoting *United States v. McDaniel*, 398 F.3d 540, 545 (6th Cir. 2005)); *see also United States v. Ford*, 761 F.3d 641, 651 (6th Cir. 2014) ("Because the statements that [the defendant] attempted to introduce were

hearsay not within any exception, the district court did not abuse its discretion by limiting the scope of [the] cross-examination.").

We conclude that the district court acted within its discretion in ruling that the segments of the interrogation video that Williston sought to admit into evidence were impermissible hearsay statements unnecessary to prevent the jury from being misled. Williston argues that the segments he sought to admit would have provided "a more complete picture of what happened" and shined a different light on his "capability of inflicting the injuries." Appellant Br. at 38. This approach does not satisfy Rule 106's requirement that Williston offer the additional statements to clarify or explain misleading government evidence.[10]

In sum, we see nothing supporting Williston's view that the government's depiction of the evidence was "one-sided, distorted, and unfair," Appellant Br. at 41, and so nothing that would inarguably necessitate the admission of Williston's hearsay statements, either directly or through cross-examination. Absent such necessity, the district court acted within its proper discretion in finding that Williston's requests were not backed by the rule of completeness or the Confrontation Clause, but were instead attempted "end-run[s] around the adversarial process."[11] *Larsen*, 175 F.

---

[10] And the government raised its point about Williston's lack of grief only in its closing rebuttal—after the defense first mentioned it in its own closing argument, citing supporting evidence from the cross-examination of the FBI agent.

[11] Because we find that Williston had no right to have his preferred hearsay segments of the videotape admitted, the district court's offer to admit the entire video obviously did not, contrary to Williston's assertion, impermissibly require him to

App'x at 242 (quoting *McDaniel*, 398 F.3d at 545). The district court acted within its proper discretion in excluding both Williston's preferred video excerpts and the FBI agent's testimony on them.

VI

Williston was eighteen-years old when he murdered Payton Cockrell. In *Miller v. Alabama*, 132 S. Ct. 2455, 2460 (2012), the Supreme Court held that any sentencing scheme that mandates a life-in-prison-without-parole sentence for an offender who is under the age of eighteen when he commits his crimes violates the Eighth Amendment's prohibition of punishments that are cruel and unusual. Williston admits that, because he was eighteen when he murdered Payton, *Miller* does not apply to him. But he urges us to expand the holding of *Miller* to offenders such as himself, who are "just over age 18" at the time of their crimes. Appellant Br. at 43. The rationales for treating juvenile offenders differently from adult offenders apply equally well to the treatment of offenders who were very recently juveniles, he argues. Thus, he asks us to apply those rationales to his case and find the statute that mandates his life-without-parole sentence unconstitutional as applied to him.

We review de novo constitutional challenges to statutes, *United States v. Price*, 265 F.3d 1097, 1106 (10th Cir. 2001), and criminal sentences, *United States v. Eaton*, 260 F.3d 1232, 1237 (10th Cir. 2001). The Supreme Court's decision to separate juvenile and adult offenders using the crude, but practicable, tool of an age

---

trade one aspect of evidentiary fairness (unfair prejudice) for another (the rule of completeness).

cutoff, as opposed to a more painstaking case-by-case analysis, necessitates some element of arbitrariness in Eighth Amendment jurisprudence in this area. But such is the law. We can offer no better comment to Williston's argument than that made by the district court at the sentencing hearing: "If the *Miller* ruling is to be expanded, it is the province of the Supreme Court to do so." R. vol. 2 at 256.

## CONCLUSION

For the reasons stated, we affirm Williston's conviction and sentence for the murder of Payton Cockrell.