22CA0009 Peo v Hazard 01-30-2025

COLORADO COURT OF APPEALS

---

Court of Appeals No. 22CA0009
El Paso County District Court No. 18CR2373
Honorable Frances R. Johnson, Judge

---

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Marquis Dantre Hazard,

Defendant-Appellant.

---

JUDGMENT AFFIRMED IN PART AND VACATED IN PART,
AND CASE REMANDED WITH DIRECTIONS

Division IV
Opinion by JUDGE HARRIS
Grove and Pawar, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced January 30, 2025

---

Philip J. Weiser, Attorney General, Emmy A. Langley, Senior Assistant Attorney General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Sean James Lacefield, Deputy State Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1     Defendant, Marquis Dantre Hazard, appeals the judgment of conviction entered after a jury found him guilty of first degree murder (after deliberation) and other offenses.  He contends that the trial court erred by admitting certain evidence concerning his police interrogation and his then girlfriend's plea agreement; by imposing a sentence of life in prison without the possibility of parole; and by entering convictions on dismissed counts and failing to merge convictions on other counts.

¶ 2     We agree that certain convictions and sentences must be vacated, either because the counts were dismissed or merger applies, and remand to the trial court for correction of the mittimus. We otherwise reject Hazard's claims and affirm the judgment of conviction.

I.     Background

¶ 3     Much of the evidence in this case was undisputed.  On April 21, 2018, Nashid Rivers shot and killed two people while he and the victims were in a car parked on a cul-de-sac in Colorado Springs. Hazard and his girlfriend were parked nearby.  After the shooting, Rivers got into the other car, and Hazard drove to Rivers' apartment.

¶ 4 Later, Hazard disposed of items connected to the murders. He first threw a bag containing Rivers' clothes into a dumpster outside a convenience store. He and his girlfriend then drove back to the scene of the shooting and retrieved two cell phones, a purse, and a backpack from the victims' car. Hazard discarded the purse and phones at different locations. The backpack contained about a pound of marijuana, which Hazard either sold or gave away.

¶ 5 Within a few days, the police had identified Hazard as a suspect and brought him to the police station for questioning. During the interview, Hazard admitted that Rivers, who he knew through an online gaming platform, had offered him $5,000 to meet at the cul-de-sac on the morning of April 21 and drive back to Rivers' apartment. Hazard also admitted that he returned to the scene after the shooting and disposed of various items connected to the crime. But he denied knowing that Rivers intended to shoot the victims.

¶ 6     Hazard was charged with two counts of first degree murder (after deliberation), two counts of first degree felony murder,[1] aggravated robbery, conspiracy, and accessory and tampering offenses.  The prosecution later dismissed the aggravated robbery counts.

¶ 7     At trial, to rebut Hazard's defense that he lacked knowledge of any plan to shoot the victims, the prosecution introduced text messages recovered from Rivers' cell phone.  In a message sent just before the shooting, Rivers told Hazard that he was "just bout to dome [a victim]," which, according to a prosecution witness, meant to shoot him in the head.  Hazard responded, "Yup for sure." During the same exchange, Hazard acknowledged that "shit" might "pop off" at the pick-up spot.  The prosecution also introduced evidence that Hazard and Rivers met at the cul-de-sac the night before the shooting, where Rivers fired a gun.

---

[1] In April 2021, the General Assembly reclassified felony murder as a class 2 felony.  Ch. 58, sec. 2, § 18-3-103(1)(b), 2021 Colo. Sess. Laws 236.  The reclassification applies to offenses committed on or after September 15, 2021.  Ch. 58, secs. 2, 6, § 18-3-103(1)(b), 2021 Colo. Sess. Laws 238.

¶ 8     The jury returned guilty verdicts on all the submitted charges. Hazard, who was nineteen at the time of the shootings and was found guilty of murder as a complicitor, argued that the mandatory sentence of life in prison without parole violated the Federal and State Constitutions' prohibition on cruel and unusual punishment. The trial court rejected the argument and imposed the statutorily mandated sentence.  *See* § 18-1.3-401(1)(a)(V)(A), C.R.S. 2024.

## II.     Evidentiary Issues

¶ 9     Hazard argues that the trial court erred by allowing the prosecution (1) to comment on his post-arrest silence by noting information he withheld during his interview and (2) to bolster the girlfriend's credibility by introducing evidence of her plea agreement's "truthfulness" requirement.

### A.     Standard of Review

¶ 10    We review a trial court's evidentiary rulings for an abuse of discretion.  *Gonzales v. People*, 2020 CO 71, ¶ 25.  To the extent an evidentiary ruling implicates a defendant's constitutional rights, we review the issue de novo.  *People v. Castro*, 2022 COA 101, ¶ 20.

¶ 11    Hazard did not preserve either of his evidentiary claims. Consequently, even if the court erred, we will not reverse unless the

error was plain. *See People v. Rodriguez*, 2021 COA 38M, ¶ 7. An error is plain when it is obvious and substantial and so undermines the fundamental fairness of the trial as to cast serious doubt on the reliability of the judgment of conviction. *Hagos v. People*, 2012 CO 63, ¶ 14. An obvious error is one that is "so clear cut . . . that a trial judge should have been able to avoid it without benefit of objection." *People v. Conyac*, 2014 COA 8M, ¶ 54. To satisfy this requirement, the challenged action ordinarily must contravene a statute, a well-settled legal principle, or Colorado case law. *Scott v. People*, 2017 CO 16, ¶ 16. Therefore, an error is not obvious when a division of the court of appeals "has previously rejected an argument being advanced by a subsequent party who is asserting plain error." *Id.* at ¶ 17.

### B. Comments on Post-Arrest Silence

#### 1. The Testimony and Comments at Trial

¶ 12    Hazard did not testify. His post-arrest statements were introduced at trial, however, through the admission of his two-and-a-half-hour police interview. Afterward, a detective testified that during the interview, Hazard had failed to disclose certain information, including

5

- that he and Rivers had met at the scene the night before;

- any explanation for why Rivers would have offered him $5,000 for a short ride;

- that after the shootings, he deleted things from his phone; and

- that on the morning of the shootings, he and Rivers had exchanged text messages in which Rivers expressed an intent to "dome" the victims and Hazard acknowledged that "shit [might] pop off."

During closing argument, the prosecutor returned to Hazard's interview omissions, arguing that

> even during the police interview, [Hazard] continued concealing. Again and again and again given chances to come forward with what he knew, the context. He didn't. Most importantly, he didn't tell you what he and [Rivers] had discussed the night before.

¶ 13 On appeal, Hazard contends that the detective's testimony and the prosecutor's argument amounted to impermissible comments on his post-arrest silence.

6

## 2.     Discussion

¶ 14     Every person has a constitutional right to remain silent during police questioning.  *See* U.S. Const. amend. V; *Miranda v. Arizona*, 384 U.S. 436, 460-61 (1966).  Indeed, before a custodial interrogation occurs, police must advise a suspect of this right. *Miranda*, 384 U.S. at 467-68.  As a result, not only is "every post-arrest silence . . . insolubly ambiguous," as it "may be nothing more than the arrestee's exercise of [his] *Miranda* rights," but the prosecutor's use of the arrestee's silence to impeach "would be fundamentally unfair" given that the *Miranda* warnings carry an implicit "assurance that silence will carry no penalty."  *Doyle v. Ohio*, 426 U.S. 610, 617-18 (1976).

¶ 15     Thus, a prosecutor may not present evidence of or comment on the defendant's post-*Miranda*-warning silence to create an inference of guilt.  *People v. Ortega*, 597 P.2d 1034, 1036 (Colo. 1979); *People v. Coleman*, 2018 COA 67, ¶ 34.  And this rule applies even when the defendant waives his right to remain silent and makes some statements.  *See Ortega*, 597 P.2d at 1037 (at theft trial, prosecutor could not impeach the defendant with his failure to tell police that he took tools from a truck to safeguard them, even

though, during a post-arrest statement, he admitted taking the tools).

¶ 16    But an exception applies when the defendant makes a statement to police that omits significant details "which are later included in a subsequent statement." *People v. Quintana*, 665 P.2d 605, 610 n.7 (Colo. 1983).  In that circumstance, "the omission of significant details is in the nature of a prior inconsistent statement." *People v. Davis*, 312 P.3d 193, 199 (Colo. App. 2010), *aff'd*, 2013 CO 57; *see also Castro*, ¶ 29 (Whether a prosecutor may impeach a defendant with his post-arrest statements depends on "whether the prosecutor's question or argument is 'designed to draw meaning from silence' or instead merely 'to elicit an explanation for a prior inconsistent statement.'" (quoting *Hendrix v. Palmer*, 893 F.3d 906, 925 (6th Cir. 2018))).

¶ 17    Hazard says that the rule, not the exception, applies here because he did not make a subsequent statement or advance an inconsistent theory of defense at trial.  Thus, he argues, the prosecutor's questions and argument could only have been an attempt to imply guilt from his silence.

¶ 18     We need not reach the merits of Hazard's argument because *People v. Lewis*, 2017 COA 147, forecloses a finding of plain error. In that case, the defendant was arrested after he sent sexually explicit messages to, and then arranged to meet, a detective posing as a fourteen-year-old girl. *Id.* at ¶¶ 2-3. He waived his *Miranda* rights and "talked freely" with police for "nearly forty minutes." *Id.* at ¶ 32. At trial, the theory of defense was that the defendant did not actually believe the person with whom he was communicating was only fourteen. *Id.* at ¶ 3. During closing argument, the prosecutor "contrasted what [the defendant] had said [during the interview] with what he had not said," including that he had never "categorically denied" that he would have had sex with the girl if she had turned out to be a minor. *Id.* at ¶ 33.

¶ 19     On appeal, the defendant argued, as Hazard does here, that the prosecutor's comments on his interview omissions were an improper attempt to imply guilt based on his right to remain silent. *Id.* at ¶ 29. The division rejected this argument. It differentiated between a scenario — like the one in *Ortega* — where a defendant makes "a brief statement, answer[s] only some questions, or volunteer[s] only limited statements" and a scenario — like the one

9

here — where a defendant "talk[s] at length, and . . . never attempt[s] to refrain from answering inquiries" or assert the right to silence or counsel. *Lewis,* ¶¶ 34-36. The division concluded that in the latter scenario, the comments concerning omissions went "not to [the defendant's] silence in the face of police questioning but, rather, to the content of his statements." *Id.* at ¶ 34.

¶ 20 In light of *Lewis,* any error in allowing the detective's testimony about, or the prosecutor's comments on, Hazard's interview omissions was not obvious. *See Scott,* ¶ 17. Contrary to Hazard's argument, that would be true even if we disagreed with *Lewis* because, at the time of trial, *Lewis* was controlling precedent, which the trial court was bound to follow. *See People v. Crabtree,* 2024 CO 40M, ¶ 53 ("[P]lainness refers to how obvious or clear-cut an error is at the time it is made."); *see also People v. Tun,* 2021 COA 34, ¶ 48 (a trial court's compliance with existing binding precedent is not plain error).

¶ 21 Nor do we view the testimony or comments as so prejudicial that their admission casts serious doubt on the reliability of Hazard's conviction. The jury viewed the interview and could see that Hazard omitted certain information that was ultimately

10

introduced into evidence. *Cf. People v. McFee*, 2016 COA 97, ¶ 78 (no plain error when witness testifies about an issue of which the jury has equal knowledge). And it was the information itself, not Hazard's failure to disclose it, that prejudiced his defense. For example, the fact that Hazard did not mention certain text messages during the interview was not more prejudicial than the fact that he exchanged text messages that tended to demonstrate his knowledge of Rivers' plan to shoot the victims. Likewise, Hazard's failure to provide an explanation about the $5,000 ride did not suggest knowledge or guilt so much as the $5,000 offer itself and his concession to the detective that Rivers would not have paid that amount for a simple ride home.

¶ 22    Finally, we disagree that the prosecutor impermissibly commented on Hazard's right not to testify when he told the jury, "[Hazard] didn't tell you what he and [Rivers] had discussed the night before."

¶ 23    To determine whether a comment constitutes an impermissible reference to the defendant's failure to testify, we consider, among other factors, whether "the comment referred specifically to the defendant's failure to take the stand or to rebut

11

the evidence against him"; whether the comments were "aggravated or repetitive"; and whether the defendant was "the only person who could refute the evidence which caused the comments to be directly pointed at the accused." *People v. Todd*, 538 P.2d 433, 436 (Colo. 1975). The prosecutor did not specifically refer to Hazard's decision not to testify. And because the comment was made during an argument about what Hazard failed to tell *the police*, we interpret the comment — which was brief and isolated — as a reference to Hazard's omissions during his interview, albeit a poorly worded reference. Thus, we cannot say that the prosecutor's comment, considered in context, was "calculated or intended to direct the attention of the jury" to his failure to testify. *Howard-Walker v. People*, 2019 CO 69, ¶ 44 (citation omitted).

¶ 24    In sum, any error in allowing the detective's testimony or the prosecutor's comments about Hazard's interview omissions was not plain and, therefore, does not warrant reversal of Hazard's convictions.

### C. Bolstering by Use of the Plea Agreement

#### 1. Evidence of the Agreement's Truthfulness Requirement

¶ 25    Before trial, Hazard's girlfriend pleaded guilty pursuant to a plea agreement to accessory to a crime, a class 6 felony. She testified that the plea agreement required her to provide truthful statements to police and at trial. Later, a detective testified that he had interviewed the girlfriend and reiterated that the plea agreement required her statements to be "truthful." The plea agreement, which was admitted into evidence, defined a "truthful statement" as "one that can be supported by other facts, physical evidence, or other corroboration."

¶ 26    On appeal, Hazard contends that the prosecution used evidence of the plea agreement's "truthfulness" requirement, including its definition of truthfulness, to impermissibly vouch for and bolster the girlfriend's credibility.

#### 2. Discussion

¶ 27    A prosecutor may elicit testimony that a plea agreement requires truthful testimony so long as he does not "express an opinion that the witness actually told the truth" or suggest that he "possesses information unavailable to the jury." *People v. Sellers,*

2022 COA 102, ¶ 30, *aff'd*, 2024 CO 64. Thus, the use of an agreement's "truthfulness" requirement amounts to impermissible bolstering only if the prosecutors "explicitly or implicitly indicate that they can monitor and accurately verify the truthfulness of the witness's testimony" — in other words, when the prosecutor essentially "guarantees . . . the veracity of the witness[]." *People v. Coughlin*, 304 P.3d 575, 583-84 (Colo. App. 2011) (citation omitted). Still, "a prosecutor does not impermissibly vouch for a witness by indicating that he or she *might* be able to verify the testimony." *Id.* at 584 (emphasis added).

¶ 28    Hazard contends that the prosecution presented evidence that the girlfriend's statements to the detective and at trial had "independent, but unknown, corroboration" and had been verified by the prosecution. No witness testified about a corroboration requirement, though, or otherwise suggested that police had verified any statements, and the prosecutor did not mention the corroboration provision during opening statement or closing argument. To the extent Hazard asserts that the alleged error stemmed from questions concerning the plea agreement's truthfulness requirement, that assertion is contradicted by settled

14

law.  *See id.* at 582; *People v. Racheli*, 878 P.2d 46, 48 (Colo. App. 1994).

¶ 29    The only reference to corroboration was in the plea agreement itself, and defense counsel did not object to its admission.  So even if the agreement's truthfulness definition implied that the girlfriend's testimony had been corroborated or verified, the court did not plainly err by admitting the agreement unless the error was obvious.  As a general matter, a plea agreement is admissible.  *See, e.g.*, *Racheli*, 878 P.2d at 48.  For the error to be obvious, then, the court had to know, without the benefit of an objection, that this particular plea agreement contained a truthfulness definition (consisting of a single sentence on page three of a thirteen-page agreement) that might imply corroboration or verification of the girlfriend's statements.  Hazard does not offer any theory to support an obviousness finding under these circumstances, and we cannot discern one.

¶ 30    We also disagree that admission of the plea agreement, even if the truthfulness definition implied corroboration, prejudiced Hazard.  He says that the jury might have read the agreement and assumed from the truthfulness definition that the girlfriend's trial

15

testimony had been corroborated or verified, even though some statements were uncorroborated. But the four statements Hazard identifies as uncorroborated were either corroborated by other evidence or of such limited probative value that the jury's assumption of corroboration would not have prejudiced his defense.

(1) According to the detective, the girlfriend told him that Hazard and Rivers went to the cul-de-sac the night before the murders, and one of them shot a gun. The girlfriend's statement was corroborated by cell phone evidence placing Hazard at the scene that night and a photograph taken shortly before the murders showing Rivers with a gun.

(2) The detective also testified that the girlfriend recalled Rivers saying, just after the shootings, that he had "domed" the victims. True, the veracity of that statement was unverified, but the prosecution introduced text messages in which Rivers told Hazard he intended to "dome" the victims, and the evidence established that Rivers shot both victims in the head.

16

(3)   Whether Hazard initially told the girlfriend that they were going to the gym on the morning of the murders, as the girlfriend testified, was immaterial, considering that Hazard admitted during his interview that he did not go to the gym, and both Hazard and the girlfriend told police that she was present at the scene.

(4)   The girlfriend testified that Rivers instructed her and Hazard to dispose of evidence, a statement corroborated by Hazard in his interview.  And an assumption of corroboration would not have prejudiced Hazard in any case, as the statement tended to show that Rivers, not Hazard, ordered the destruction of evidence.

¶ 31   Accordingly, we perceive no plain error in the admission of the plea agreement or testimony about its truthfulness requirement.

III.   Constitutionality of the Life-Without-Parole Sentence

¶ 32   Both the Federal and Colorado Constitutions prohibit "cruel and unusual punishments."  U.S. Const. amend. VIII; Colo. Const. art. II, § 20.  Recognizing that "children are constitutionally different from adults for purposes of sentencing," the Supreme Court has held that mandatory life-without-parole sentences for

juveniles are unconstitutional. *Miller v. Alabama*, 567 U.S. 460, 470-71 (2012).

¶ 33     On appeal, Hazard argues that because mandatory life-without-parole sentences for juveniles violate the Eighth Amendment, and "youthful offenders" (a class Hazard defines as "those under 21 years old at the time of the offense") share many of the characteristics of juveniles, then mandatory life-without-parole sentences for youthful offenders also violate the Eighth Amendment.

¶ 34     But the Supreme Court has already considered and rejected this argument, which is just another way of saying that drawing a constitutional line at eighteen is arbitrary. In *Roper v. Simmons*, 543 U.S. 551, 574 (2005), the Court acknowledged that the "qualities that distinguish juveniles from adults do not disappear when an individual turns 18," and it foresaw objections to "[d]rawing the line at 18 years of age." Nonetheless, it determined that "a line must be drawn," and eighteen is a rational place to draw it, as that is the "point where society draws the line for many purposes between childhood and adulthood." *Id.*

¶ 35    We may not redraw an Eighth Amendment line — that is up to the Supreme Court.  *See People v. Parks*, 987 N.W.2d 161, 172 (Mich. 2022) ("[W]e cannot contradict the Supreme Court if it has drawn a clear and unambiguous line under the United States Constitution between those under the age of 18 and those aged 18 and older."); *see also United States v. Chavez*, 894 F.3d 593, 609 (4th Cir. 2018) (declining to redraw *Miller*'s line between juvenile and adult, even though "individual differences in maturity will necessarily mean that age-based rules will have an element of arbitrariness"); *United States v. Williston*, 862 F.3d 1023, 1039-40 (10th Cir. 2017) (recognizing that *Miller*'s "age cutoff" between juveniles and adult offenders raises "some element of arbitrariness" but explaining that "[i]f the *Miller* ruling is to be expanded, it is the province of the Supreme Court to do so").

¶ 36    Hazard's argument relying on the state constitution is equally unavailing.  Although state courts are free to interpret state constitutional provisions more expansively than identical provisions of the United States Constitution, *see Rocky Mountain Gun Owners v. Polis*, 2020 CO 66, ¶ 34, our supreme court has declined to interpret article II, section 20, of the Colorado Constitution to

19

provide greater protection than the Eighth Amendment. *See Sellers v. People*, 2024 CO 64, ¶ 36; *cf. Commonwealth v. Mattis*, 224 N.E.3d 410, 415 (Mass. 2024) (extending *Miller*'s holding to twenty-year-olds under the state constitution);[2] *Parks*, 987 N.W.2d at 170 (extending *Miller*'s holding to eighteen-year-olds under the state constitution, which "has historically afforded greater bulwarks against barbaric and inhumane punishments"); *Matter of Monschke*, 482 P.3d 276, 279 n.6, 280 (Wash. 2021) (extending *Miller*'s holding to twenty-year-olds under the state constitution, which "provides greater protection than the Eighth Amendment") (citation omitted).

¶ 37 The exercise of our independent judgment is still limited by "standards elaborated by controlling precedents." *Graham v. Florida*, 560 U.S. 48, 61 (2010) (citation omitted). Accordingly, only our supreme court, not this court, can decide that article II, section 20, provides greater protections than the Eighth Amendment,

---

[2] The Massachusetts Supreme Court had previously held that the state's Declaration of Rights affords criminal defendants greater protections "than are available under corresponding provisions of the Federal Constitution." *Diatchenko v. Dist. Att'y for Suffolk Dist.*, 1 N.E.3d 270, 283 (Mass. 2013).

which, in turn, would provide an avenue for extending *Miller* to non-juveniles.

## IV. Erroneously Entered Convictions

### A. Aggravated Robbery

¶ 38    Before jury deliberations, the prosecution dismissed the two counts of aggravated robbery and the associated crime of violence sentence enhancers. Nonetheless, the trial court entered convictions and sentences for aggravated robbery.

¶ 39    Hazard contends, the People concede, and we agree that the court erred by entering convictions on the substantive counts and the sentence enhancers. *See People v. Oliver*, 2018 COA 146, ¶ 11 ("[A] judgment of conviction absent a jury verdict of guilty is structural error . . . .").

### B. Conspiracy

¶ 40    Hazard was convicted of one count of conspiracy to commit first degree murder and two counts of conspiracy to commit aggravated robbery. The court entered separate convictions and sentences on the three counts.

¶ 41    Hazard contends, the People concede, and we agree that because the underlying crimes were part of a single criminal

episode, the court should have merged the conspiracy convictions and entered a single conviction and sentence for conspiracy to commit first degree murder. *See* § 18-2-201(4) ("If a person conspires to commit a number of crimes, he is guilty of only one conspiracy so long as such multiple crimes are part of a single criminal episode."); *People v. Woodyard*, 2023 COA 78, ¶ 86 (In accordance with double jeopardy principles, "a single conspiratorial agreement may not be divided into multiple charges.") (citation omitted).

## V. Disposition

¶ 42    The convictions and sentences for aggravated robbery (counts 10 and 26) and the convictions for the associated sentence enhancers (counts 11, 12, 27 and 28) are vacated, as are the convictions and sentences for conspiracy to commit aggravated robbery (counts 13 and 29). Accordingly, we remand to the trial court for correction of the mittimus. In all other respects, the judgment of conviction is affirmed.

JUDGE GROVE and JUDGE PAWAR concur.