*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

WILLIE DEANDRE HASSEL,

        Defendant-Appellant.

UNPUBLISHED
July 23, 2020

No. 346378
Berrien Circuit Court
LC No. 2017-004860-FC

Before: BORRELLO, P.J., and SAWYER and SERVITTO, JJ.

PER CURIAM.

Defendant, Willie Deandre Hassel, appeals by right his jury convictions of carrying a concealed weapon (CCW) in a vehicle, MCL 750.227(1); carrying or possessing a firearm during the commission of a felony (felony-firearm), MCL 750.227b; first-degree felony murder, MCL 750.316(1)(b); armed robbery, MCL 750.529; and conspiracy to commit armed robbery, MCL 750.157a; MCL 750.529, arising from the shooting death of John Conyers in April 2017. The jury also found Hassel guilty of second-degree murder arising from Conyers's death, but the trial court vacated that conviction. The trial court sentenced Hassel to serve 38 months to 60 months in prison for his CCW conviction, two years in prison for his felony-firearm conviction, life without the possibility of parole for his felony-murder conviction, and 20 to 40 years in prison each for his armed-robbery and conspiracy-to-commit-armed-robbery convictions. On appeal, Hassel raises a variety of errors that he claims rendered his trial unfair and argues that this Court should conclude that his sentence was unconstitutional. For the reasons more fully explained below, we reject those claims of error and affirm.

## I. BASIC FACTS

The testimony and evidence showed that Hassel met up with Brianna Isom and Keeyon Williams on April 7, 2017. Williams and Hassel discussed stealing Xanax pills from Conyers and then arranged to meet Conyers in the parking lot of the Benton Harbor Salvation Army. Isom drove Williams and Hassel to the parking lot. Once there, Williams and Hassel approached Conyers, who showed them a bottle of Xanax pills. When Williams and Hassel took the pills,

-1-

Conyers fought them. The evidence showed that Hassel took a handgun from his pants and shot Conyers twice. Conyers died shortly thereafter.

## II. SUPPRESS SEARCH OF PHONE

### A. STANDARD OF REVIEW

Hassel first argues that defense counsel's failure to move to suppress the search of his phone amounted to ineffective assistance of counsel because the affidavit in support of the search warrant was plainly defective. Whether defense counsel was ineffective involves a mixed question of fact and law. *People v Gioglio (On Remand)*, 296 Mich App 12, 19; 815 NW2d 589 (2012), vacated on other grounds 493 Mich 864 (2012). This Court reviews de novo whether a particular act or omission fell below an objective standard of reasonableness under prevailing professional norms and prejudiced the defendant's trial. *Id*. at 19-20. This Court also reviews de novo the proper application of constitutional standards. See *People v Martin*, 271 Mich App 280, 297; 721 NW2d 815 (2006). When reviewing a magistrate's decision to issue a warrant, this Court limits its review to ensuring that there was a substantial basis for the magistrate's determination that there was a fair probability that the search would reveal evidence of a crime. *Id*.

### B. ANALYSIS

To establish his claim of ineffective assistance of counsel, Hassel must show that defense counsel's failure to move to suppress the search of his phone fell below an objective standard of reasonableness under prevailing professional norms and that there is a reasonable probability that, but for his failure to move to suppress, the outcome of the proceedings would have been different. See *Gioglio*, 296 Mich App at 22. In order to establish the prejudice prong, Hassel must "prove that his Fourth Amendment claim is meritorious and that there is a reasonable probability that the verdict would have been different absent the excludable evidence." *Kimmelman v Morrison*, 477 US 365, 375; 106 S Ct 2574; 91 L Ed 2d 305 (1986).

On appeal, Hassel claims that officers searched his phone under an invalidly issued search warrant. More specifically, he maintains that the magistrate issued the search warrant even though the affidavit in support of the request did not create an inference that there was a fair probability of finding evidence of a crime on the cell phone. Instead, citing one paragraph of the affidavit, Hassel states that the affiant merely asserted that cell phones often contain evidence of crimes, which was insufficient to establish grounds for issuing a warrant for the search of his phone.

The magistrate could not issue the warrant unless the request for a warrant was supported by averments establishing facts within the affiant's knowledge that demonstrated probable cause to justify the search. See *Martin*, 271 Mich App at 298. Probable cause exists when there are facts from which the magistrate can conclude that there is a substantial basis for inferring a fair probability that contraband or evidence of a crime will be found in a particular place. *Id*.

Hassel complains that ¶ 3(J) of the affidavit in support was insufficient to establish probable cause because the affiant—Sergeant Jason Bailey of the Michigan State Police—merely asserted that it was his experience that cell phones are often used in crimes without connecting Hassel's cell phone to any crime. In ¶ 3(J), Sergeant Bailey averred:

Based on your Affiant's training and experience, it is known that mobile communication devices are often used to plan, commit, and conceal criminal activity and evidence. It is also Affiant's belief that John Conyers may have communicated with his assailant prior to his death. Therefore, data obtained from mobile communication devices and records created by these devices can assist law enforcement in establishing the involvement of a possible suspect or suspects.

Read in isolation, these averments would have been insufficient to establish probable cause to search Hassel's phone because the averments did not connect Hassel and his phone sufficiently to Conyers's death. But courts do not read such affidavits in isolation—courts read them in a "commonsense and realistic manner to determine whether a reasonably cautious person could have concluded that there was a substantial basis for finding probable cause." *Id*. When Sergeant Bailey's averments are read in a commonsense manner, the averments as a whole established probable cause to search Hassel's phone.

Sergeant Bailey averred that he was investigating Conyers's homicide. He stated that Conyers was shot in the parking lot of the Salvation Army after a fight with two or possibly three unknown black men. He averred that witnesses established that Conyers had been sitting in his truck just before the fight and shooting. Sergeant Bailey averred that police officers received an anonymous tip that, at the time of the incident, Conyers was selling prescription drugs to Hassel and Williams. He also noted that a witness identified Hassel from a photographic lineup as the man who shot Conyers. These averments permitted an inference that Hassel was one of the men who met with Conyers on the day at issue, that he met him to make an illegal drug purchase, and that he was involved in Conyers's homicide. When ¶ 3(J) is read in conjunction with those averments, that paragraph permits an inference that Hassel's phone might have been used to arrange a drug purchase from Conyers on the day at issue or to conceal the crimes that occurred. As such, reading the averments together, a reasonably cautious magistrate could conclude that there was a substantial basis for inferring a fair probability that Hassel's phone contained evidence of a crime. See *id*.

The search warrant was properly supported by oath or affirmation and established probable cause for the search. As such, any motion to suppress the search on the ground that the affidavit in support of the search warrant was deficient would have been futile. Defense counsel cannot be faulted for failing to make a futile motion. See *People v Riley*, 468 Mich 135, 142; 659 NW2d 611 (2003).

Even if the affidavit could be said to have contained some technical deficiency, it appeared on its face to be adequate—that is, it was not so lacking in indicia of probable cause that reasonable officers could not objectively rely on a warrant issued on the basis of the assertion of probable cause stated in the affidavit. See *People v Hellstrom*, 264 Mich App 187, 197; 690 NW2d 293 (2004). Moreover, there is no evidence that the magistrate was misled by false information. See *id*. As such, even if the warrant were inadequate on some level, the deficiency would not warrant the exclusion of the evidence obtained in reliance on the warrant. See *id*. at 199-200. Consequently, Hassel cannot establish that defense counsel's failure to challenge the warrant amounted to ineffective assistance that prejudiced his trial. See *Gioglio*, 296 Mich App at 22; see also *Kimmelman*, 477 US at 375.

## III. SUPPRESS STATEMENT

## A. STANDARD OF REVIEW

Hassel next argues that the trial court erred when it denied his motion to suppress his statement to detectives Michael Logan and Brian Kastelic on the ground that his statement was involuntary.

> This Court reviews for clear error a trial court's factual findings in a ruling on a motion to suppress evidence. *People v Tanner*, 496 Mich 199, 206; 853 NW2d 653 (2014). A trial court's factual findings are clearly erroneous when this Court is left with a definite and firm conviction that the trial court made a mistake. See *People v Johnson*, 502 Mich 541, 565; 918 NW2d 676 (2018). "The decision whether to admit evidence is within a trial court's discretion. This Court reverses it only where there has been an abuse of discretion." *People v Katt*, 468 Mich 272, 278; 662 NW2d 12 (2003). A trial court abuses its discretion when it selects an outcome that falls outside the range of reasonable and principled outcomes. *Johnson*, 502 Mich at 564. "To the extent that the trial court's ruling involves an interpretation of the law or the application of a constitutional standard to uncontested facts, our review is de novo." *Tanner*, 496 Mich at 206 (cleaned up). [*People v Clark*, ___ Mich App ___, ___; ___ NW2d ___ (2019) (Docket No. 343607); slip op at 10-11.]

## B. ANALYSIS

Once an individual is taken into custody, police officers must follow several procedural safeguards before the officers may interrogate the individual. See *People v Daoud*, 462 Mich 621, 632; 614 NW2d 152 (2000). The officers must inform the person of the right to remain silent, must inform him or her that anything he or she says can be used against him or her, and must inform the person of the right to have an attorney present during the interrogation and the right to have an attorney provided at state expense if he or she cannot afford one. *Id.* at 633. The purpose of the safeguards is to ensure that the individual has a full opportunity to exercise his or her privilege against self-incrimination. *Id.* at 632. A defendant may, however, waive those rights and speak with the officers "provided the waiver is made voluntarily, knowingly and intelligently." *Id.* at 633 (quotation marks and citation omitted).

Whether a statement was voluntarily made is a separate inquiry from whether it was knowingly and intelligently made. See *People v Elliason*, 300 Mich App 293, 304; 833 NW2d 357 (2013). On appeal, Hassel does not argue that he lacked sufficient understanding to make a knowing and intelligent waiver. See *id.* (noting that the knowing and intelligent prong involves an inquiry into the defendant's level of understanding). Instead, he argues that the detectives who interviewed him engaged in misconduct that rendered his statement involuntary. It is a violation of due process to use a confession that has been coerced by an officer's conduct. See *People v Wells*, 238 Mich App 383, 386; 605 NW2d 374 (1999). Once challenged, it is the prosecutor's burden to establish by a preponderance of the evidence that the defendant voluntarily made the statement. See *People v Etheridge*, 196 Mich App 43, 57; 492 NW2d 490 (1992).

-4-

The test for voluntariness is whether, considering the totality of all the circumstances, the person's statement was the product of an essentially free and unconstrained choice, or whether the person's will has been overborne, and his or her capacity for self-determination critically impaired. See *People v Cipriano*, 431 Mich 315, 333-334; 429 NW2d 315 (1988). The purpose of excluding statements obtained by coercion is to deter official misconduct. *Id*. at 332. As such, the focus is on the conduct identified as coercive, see *People v Shipley*, 256 Mich App 367, 373; 662 NW2d 856 (2003), and whether the conduct was causally related to the person's decision to give a statement, see *Wells*, 238 Mich App at 388.

When determining whether a statement was coerced by police conduct, courts should examine the following nonexhaustive list of factors:

> [T]he age of the accused; his lack of education or his intelligence level; the extent of his previous experience with the police; the repeated and prolonged nature of the questioning; the length of the detention of the accused before he gave the statement in question; the lack of any advice to the accused of his constitutional rights; whether there was an unnecessary delay in bringing him before a magistrate before he gave the confession; whether the accused was injured, intoxicated or drugged, or in ill health when he gave the statement; whether the accused was deprived of food, sleep, or medical attention; whether the accused was physically abused; and whether the suspect was threatened with abuse. [*Cipriano*, 431 Mich at 334.]

In this case, the trial court held an evidentiary hearing to consider whether Hassel's statement was, in relevant part, voluntarily made, or instead was the product of coercion. The trial court heard an audio recording of Hassel's statement, reviewed the documentary evidence of Hassel's agreement to waive his right to remain silent, and took testimony from the detectives who conducted the interrogation. After the hearing, the trial court found that the detectives had followed the required procedural safeguards and advised Hassel of his rights. The court further noted that Hassel had had several contacts with police officers arising from earlier incidents, and he had even agreed to waive his rights in a recent case in which he also gave an incriminating statement. On the basis of that evidence, the trial court found that Hassel's initial decision to speak with the officers was voluntary.

The trial court then turned to whether police conduct during the interrogation coerced Hassel's statement. The court first recited the various factors identified by our Supreme Court in *Cipriano*. The court found that Hassel was 20 years of age and had a high school diploma. The court further stated that there was no evidence that Hassel was low functioning. The court also restated the evidence that Hassel had had previous contacts with police officers, had once before waived his right to remain silent, and had provided a statement to officers. The court also found that the interview was not particularly long given the severity of the incident: it was only 57 minutes from start to finish. The court indicated that Hassel had been advised of his rights and was in jail as a result of charges stemming from an incident in Kent County; he had not been arrested or charged for anything arising from the shooting of Conyers. The court indicated that Hassel never told the detectives that he was ill or needed a break, and there was no evidence that he was deprived of food, sleep, or medical attention. There was also no evidence that Hassel had been physically abused or threatened with abuse. The court opined that all the factors set forth in

*Cipriano* supported the conclusion that Hassel's statement was voluntary. The record fully supports the trial court's findings regarding the listed factors; as such, it did not clearly err in making them. See *Clark*, ___ Mich App at ___; slip op at 10-11.

The trial court next considered whether Hassel's will had been overborne by the detectives' conduct during the interrogation. The court recognized that the detectives had spoken with Hassel about the potential charges. They even suggested that he might be subject to less time in prison if he made a statement mitigating the circumstances of the shooting, and so might be in a position to see his child again. Despite these comments, the trial court found that the detectives did not actually promise Hassel leniency. The court noted that Hassel himself asserted that he was responsible even if the shooting was accidental. The court determined that the detectives' statements about possible penalties and their suggestions that Hassel might be guilty of a less serious offense were not improper and did not render Hassel's statement involuntary.

The trial court did not clearly err when it found that the detectives did not promise Hassel leniency in exchange for his statement. See *id*. Detective Kastelic testified that he did not make any promises to Hassel, and he did not state that Hassel would be charged with something specific. He did describe—consistent with his experience—that murder charges could be pleaded down; he further agreed that that was a possibility in this case too. Similarly, Detective Logan testified that he did not threaten or promise Hassel anything in exchange for Hassel's statement. The detectives' recollection was consistent with the recording of Hassel's statement.

The recording showed that Detective Kastelic told Hassel that he did not believe that Hassel intended to kill Conyers, but that things just "went sideways." He further said that this was Hassel's "chance to tell us what the hell happened back there." Detective Logan told Hassel that he too did not think that Hassel intended to kill Conyers—but he stated that it was not a question whether Hassel shot him. He informed Hassel that they knew from witnesses that Hassel had in fact shot and killed Conyers. Detective Logan asserted that he did not want the prosecutor to charge Hassel with open murder because that would result in Hassel spending the rest of his life in prison. That, he stated, was what they were trying to avoid by giving Hassel the opportunity to tell his side of the story. Detective Kastelic informed Hassel that he could stick with his story that he was at home watching Netflix when the shooting occurred, but he related that that was not going to help given the eyewitnesses: "[Y]ou know it's bullshit, I know it's bullshit, the jury's gonna know it's bullshit, you know." He then suggested that, depending on what happened, the charges might not be so severe: "I'm not gonna sugar coat anything Willie, you are going to have to take responsibility for your actions, but you know, maybe they can charge you with second or maybe manslaughter and get you a 20 year sentence, 15, something other than life."

The recording does not show that the detectives threatened Hassel. There was also no indication in the recording of the interview that the detectives assured Hassel that he would avoid the most serious charges if he gave a statement. Rather, they indicated that the evidence that Hassel killed Conyers was overwhelming and that the only way he might receive a less serious sentence would be if the shooting involved mitigating circumstances. They then suggested types of mitigating circumstances that might apply, and informed Hassel that this was his opportunity to tell his version of events. Although the detectives dangled the prospect of a less serious charge before Hassel, they did not specifically promise him that he would receive a less serious charge if he gave a statement. Rather, the detectives repeatedly related—albeit indirectly—that it was up to

the prosecutor to decide the charges. On this record, the trial court did not clearly err when it found that the detectives did not promise Hassel leniency or threaten him. See *id.*; see also *People v Gipson*, 287 Mich App 261, 266; 787 NW2d 126 (2010) (stating that this Court defers to a trial court's resolution of conflicting accounts such as whether officers threatened the defendant).

Finally, the trial court addressed the detectives' comments about juries in Berrien County. During the interview with Hassel, Detective Logan asked Hassel to think about going before a jury in Berrien County:

> [*Detective Kastelic*]: How do you think that's gonna play out for you, other than, other than, it wasn't me I wasn't there. I mean you can do that all you want, but I'm gonna tell you that's not gonna work out well for ya.
>
> [*Detective Logan*]: That's what everyone says.
>
> [*Detective Kastelic*]: Yeah.
>
> [*Detective Logan*]: And dude, who do you think a jury of your peers are[?] You're, you're in this, you're in Berrien County in the City of St. Joseph, [Michigan], who do you think your peers are[?] Who do you think those jury members are going to be[?]
>
> [*Detective Kastelic*]: That actually show up for jury duty.
>
> [*Detective Logan*]: Do you think they're going to be [twelve] cats that look like you, and [… and] are you. They['re] going to be [eight] cats that look like him[,] and a couple that look like me. That's a jury of your peers. You, you understand you don't have a jury of your peers. You have a jury of a bunch of white folks and a couple black people blended in.
>
> [*Detective Kastelic*]: That's the harsh reality.
>
> [*Detective Logan*]: That's the harsh reality of it.[1]

The trial court made it clear that it found the comments reprehensible. Indeed, the court stated that in "one fell swoop" the detectives "slandered all of the jurors who have come" into the courthouse and dutifully served and who happened to be white. The trial court related that it had been its experience that jurors "argue over the facts and evidence presented in a case to arrive at the verdict, not the color of the defendant's skin." The court found that the statement did not appear to be a tactic that the detectives had been trained to use: "It was an ad-lib; a stupid, ill-conceived and not thought-out ad-lib at that. And I certainly hope I never again see it in any case I'm asked to review . . . ."

---

[1] We have used the transcript of the interrogation for this quotation, but have corrected it using the audio recording. Corrected material appears between brackets.

Although the trial court concluded that the statements were improper, it nevertheless found that the comments did not coerce Hassel into making his statement. The court explained that, after listening to the recording and reading the transcript several times, it did not believe that Hassel elected to give his statement as a product of this ad-lib—as disturbing as it was. Rather, the court found that Hassel agreed to speak after the detectives revealed that he had already been placed at the scene by the two people who were with him. The court concluded that the prosecutor had met its burden and showed by a preponderance that Hassel's statement was the product of an essentially free and unconstrained choice.

The record supports the trial court's finding that the improper comments about jurors did not overwhelm Hassel's will. The comments about the jury lasted for approximately one minute of a nearly 58-minute interview. And Hassel said nothing for several minutes of additional commentary by the detectives after the improper comments about juries. When he finally did speak, it was in response to the detectives' claims that Williams and Isom had told them the whole story. Hassel asserted that Williams and Isom were lying. When Detective Kastelic asked Hassel if he believed that Williams and Isom had told them what happened, Hassel agreed that they must have because otherwise the detectives would not be there. After Hassel agreed that Williams and Isom must have spoken with the officers, Detective Kastelic told Hassel that he was in fantasy land if he thought this case was going away. He told Hassel that he would be charged and that it was up to him to "minimize the damage." It was after that point—between 10 to 12 minutes after the comments about jurors—that Hassel began to describe the shooting as an accident. The trial court did not err when it found that Hassel was not prompted to make a statement as a result of the comments about jurors. *Id*.

The record shows that the detectives misrepresented the extent of the evidence that they had implicating Hassel. They also improperly suggested that Hassel should consider whether he could get a fair trial in Berrien County. But these were just two factors of many to consider when determining whether Hassel's statement was voluntary. See *People v Hicks*, 185 Mich App 107, 113; 460 NW2d 569 (1990) (stating that the police officer's misrepresentation about a fingerprint was insufficient to render an otherwise voluntary statement involuntary); accord *People v Givans*, 227 Mich App 113, 122-124; 575 NW2d 84 (1997). And the record supported the trial court's findings that the improper tactics were not causally related to Hassel's decision to give a statement. See *Wells*, 238 Mich App at 388 (stating that there must be a causal relationship between the police conduct and the decision to give a statement). Consequently, the trial court did not err when it determined that, under the totality of the circumstances, Hassel's statements were the product of an essentially free and unconstrained choice by its maker. See *Cipriano*, 431 Mich at 334, 338-339.

IV. IMPROPER USE OF SILENCE

A. STANDARD OF REVIEW

Hassel next argues that the prosecutor engaged in misconduct by questioning him about his silence and arguing from his silence in his closing statement. Although defense counsel objected to the prosecutor's questions implicating Hassel's silence, defense counsel did not object to the prosecutor's closing remarks. Therefore, Hassel's claim that the prosecutor improperly argued silence in his closing statement is unpreserved. See *People v Bennett*, 290 Mich App 465,

475; 802 NW2d 627 (2010). This Court reviews de novo whether the trial court properly applied a constitutional standard. See *People v Shafier*, 483 Mich 205, 211; 768 NW2d 305 (2009). However, this Court reviews unpreserved claims of constitutional error for plain error affecting the defendant's substantial rights. See *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999).

## B. ANALYSIS

In *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966), the Supreme Court of the United States required officers to warn every person subject to custodial interrogation that he or she has the right to remain silent, among other procedural safeguards. See *Shafier*, 483 Mich at 212. As a general rule, if a person chooses to remain silent in response to police questioning after being provided the warnings required under *Miranda*, that silence may not be used as evidence against that person. *Id*. For that reason, it is generally a violation of due process for a prosecutor to refer to the defendant's postarrest, post-*Miranda* silence. *Id*.

The rule has two rationales. The defendant's silence may merely be the invocation of the right rather than a tacit admission of guilt. *Id*. at 213. Additionally, the warnings required under *Miranda* include an implicit promise that the defendant will not be punished for exercising his or her right to remain silent. *Id*. "Once the government has assured a person of his right to remain silent, breaching the implied assurance of the *Miranda* warnings is an affront to the fundamental fairness that the Due Process Clause requires." *Id*. (quotation marks and citation omitted). For these reasons, "a defendant's post-arrest, *post-Miranda* silence cannot be used to impeach a defendant's exculpatory testimony, or as direct evidence of defendant's guilt in the prosecutor's case-in-chief." *Id*. at 213-214 (citations omitted).

The United States Supreme Court has not, however, extended the rule to cross-examination concerning testimony at trial that is inconsistent with the defendant's earlier statement to police officers after having received the warnings required by *Miranda*: "Such questioning makes no unfair use of silence because a defendant who voluntarily speaks after receiving *Miranda* warnings has not been induced to remain silent. As to the subject matter of his statements, the defendant has not remained silent at all." *Anderson v Charles*, 447 US 404, 408; 100 S Ct 2180; 65 L Ed 2d 222 (1980). The Court in *Anderson* also rejected the contention that the prosecutor could not inquire about the defendant's failure to earlier relate the same story that he told at trial. The Court explained that such a question does not refer to the defendant's exercise of the right to remain silent, but instead asks why the defendant did not earlier tell the officer the same version, if the defendant's trial testimony were true. *Id*. at 409. The Court conceded that such a line of questioning involves some aspect of silence: "Each of two inconsistent descriptions of events may be said to involve 'silence' insofar as it omits facts included in the other version." *Id*. However, the Court refused to extend the rule prohibiting the use of silence to "any such formalistic understanding of 'silence.' " *Id*.

Our Supreme Court has similarly held that a prosecutor may cross-examine a defendant about inconsistencies between his or her trial testimony and an earlier post-*Miranda* statement to police officers. See *People v Cole*, 411 Mich 483, 488; 307 NW2d 687 (1981). Consistent with the decisions in *Anderson* and *Cole*, this Court has explained that, "[w]here a defendant makes statements to the police after being given *Miranda* warnings, the defendant has not remained silent,

and the prosecutor may properly question and comment with regard to the defendant's failure to assert a defense subsequently claimed at trial." *People v Avant*, 235 Mich App 499, 510; 597 NW2d 864 (1999), citing *People v Davis*, 191 Mich App 29, 34-35; 477 NW2d 438 (1991).

As already discussed, Hassel voluntarily waived his right to remain silent after being provided with the warnings required under *Miranda*. He told the detectives that he accompanied Williams to the Salvation Army's parking lot to rob Conyers of Xanax. He further stated that it was his job just to hold the handgun, which he described in detail, but that he ended up accidentally shooting Conyers. At trial, Hassel denied that he participated in the shooting. Instead, he asserted that he only confessed because the detectives told him he would be charged with murder and would be found guilty by a biased jury. He also explained to the jury that he knew about specific details from the shooting because his friend, Kyree Hall, told him the details.

The prosecutor cross-examined Hassel about the inconsistencies between his statement to the detectives and his testimony at trial. The prosecutor asked Hassel if it was correct that this was "the first time we're hearing" that Hall told Hassel all these details about the shooting and Hassel agreed that that was true. Hassel also agreed that Hall had since died and could not be questioned about the conversation when he purportedly told Hassel these details. The prosecutor further questioned Hassel about the length and timing of the conversation when Hall purportedly passed these very precise details, which he remarkably still remembered when he spoke to the detectives, and reiterated that this explanation for Hassel's detailed knowledge was only now coming forth.

In his statement to the detectives, Hassel described the events in considerable detail. His statement that he accidentally shot Conyers as part of a robbery gone bad was inconsistent with his later testimony that he had no involvement with the shooting. Further, he described the incident in detail and in a way that was consistent with eyewitness statements and physical evidence known only to officers. From those facts, one could infer that Hassel made his statement from knowledge that would not have been known to anyone but the shooter. Yet at trial he denied being the shooter and asserted that someone else provided him with the details, which that person obtained from yet a third person.

As this Court has previously stated, a defendant cannot both assert the right to remain silent and offer police officers a statement:

> Defendant here did not choose to remain silent. He chose to speak. Defendant cannot have it both ways—he cannot choose to speak and at the same time retain his right to remain silent. Absent an affirmative and unequivocal invocation of his right to remain silent following a postarrest, post-*Miranda* statement to police, defendant cannot claim that his right to remain silent was infringed by the prosecutor's questions and comments about his failure to assert his claim of self-defense before trial. The prosecutor's questions and comments here did not result in manifest injustice. [*Davis*, 191 Mich App at 36-37.]

Because Hassel's testimony at trial was inherently inconsistent with what he told the detectives, the prosecutor could properly question Hassel about the inconsistencies, including his failure to inform the officers that the only reason he knew about the details of the shooting was because Hall had told him those details after purportedly speaking with Williams. See *Anderson*,

447 US at 408-409. Such an inquiry does not amount to an improper use of Hassel's right to remain silent; rather, it attacks the inconsistency between the two versions of events and suggests that the earlier statement is the more plausible version. See *id*.

For the same reason, the prosecutor could properly question Hassel about his failure to inform the detectives that Hall told him the real shooter was a man named Duke. The detectives specifically asked Hassel whether people referred to him as Duke and Hassel denied that that was his nickname; notably, he did not offer that his friend Hall told him that that was the name of the shooter. Likewise, the prosecutor could properly argue that Hassel's failure to earlier disclose that Hall told him the details and identified the shooter as a man named Duke was evidence that Hassel only recently fabricated that defense. See *Davis*, 191 Mich App at 36-37.

The section of the prosecutor's argument that defendant cites on appeal also includes an argument in which the prosecutor noted that Hassel's mother, Deanna Porter, only recently came forth and stated that she was with Hassel at the time of the shooting. A prosecutor may properly question an alibi witness about his or her failure to come forward earlier, and such questioning does not implicate the defendant's constitutional rights. See *People v Gray*, 466 Mich 44, 48; 642 NW2d 660 (2002) ("A tardily raised or incredible claim of alibi may be challenged as part of the truth-seeking process that is a criminal trial."); see also *United States v Aguwa*, 123 F3d 418, 420-421 (CA 6, 1997). As this Court has stated, the "credibility of a witness may be attacked by showing that he failed to speak or act when it would have been natural to do so if the facts were in accordance with his testimony." *People v Diaz*, 98 Mich App 675, 683; 296 NW2d 337 (1980). As such, to the extent that Hassel challenges the prosecutor's questions and comments concerning his alibi witness's failure to come forward with her information earlier, that claim too is meritless.

The trial court did not err when it allowed the prosecutor to question Hassel about inconsistencies between his trial testimony and his earlier statement to police officers. The prosecutor also did not commit misconduct by arguing that the best explanation for the inconsistencies was that Hassel made up the version that he gave at trial. See *Davis*, 191 Mich App at 36-37.

V. CRUEL AND UNUSUAL PUNISHMENT

A. STANDARD OF REVIEW

Hassel next argues that this Court should extend the holdings in *Graham v Florida*, 560 US 48; 130 S Ct 2011; 176 L Ed 2d 825 (2010), and *Miller v Alabama*, 567 US 460; 132 S Ct 2455; 183 L Ed 2d 407 (2012), to include 19-year-old individuals as a category of young adult offenders and establish a categorical bar against the imposition of a mandatory sentence of life without the possibility for young adult offenders who commit felony murder.[2] To preserve a claim that his sentence violates the Eighth Amendment to the Constitution of the United States, Hassel

---

[2] In his brief on appeal, Hassel asserts that the mandatory sentence is unconstitutional on its face and as applied. However, he does not address an as-applied challenge. Rather, he asserts a facial challenge and invites this Court to adopt a categorical ban. Hassel abandoned his as-applied challenge by failing to offer any meaningful analysis. See *Martin*, 271 Mich App at 315.

had to raise that ground before the trial court. See *People v Bowling*, 299 Mich App 552, 557; 830 NW2d 800 (2013). Hassel did not challenge the constitutionality of his sentence before the trial court. Therefore, this issue is unpreserved. See *id*.

This Court reviews de novo whether the trial court properly applied constitutional principles. *Clark*, ___ Mich App at ___; slip op at 10-11. However, this Court reviews unpreserved claims of constitutional error for plain error affecting the defendant's substantial rights. See *Carines*, 460 Mich at 763. To prevail, the defendant must demonstrate that the trial court committed a plain or obvious error and that the error affected the outcome of the lower court proceeding. *Id*.

B. ANALYSIS

The Constitution of the United States prohibits the imposition of cruel and unusual punishments, US Const, Am VIII, and the Michigan Constitution prohibits cruel *or* unusual punishments, Const 1963, art 1, § 16. Although the two clauses are different, this Court has acknowledged that, if a punishment passes muster under the state constitution, it necessarily passes muster under the federal constitution. See *People v Benton*, 294 Mich App 191, 204; 817 NW2d 599 (2011). And our Supreme Court has held that a mandatory sentence of life without the possibility of parole—at least as applied to adult offenders—does not violate Michigan's prohibition against cruel or unusual punishments. See *People v Hall*, 396 Mich 650, 657-658; 242 NW2d 377 (1976). The Supreme Court of the United States has, however, determined that the Eighth Amendment limits the authority of the state to impose a mandatory penalty of life without the possibility of parole on juvenile offenders.

In *Graham*, the Supreme Court of the United States considered whether it amounted to cruel and unusual punishment within the meaning of the Eighth Amendment to the Constitution of the United States to sentence a juvenile offender to life without the possibility of parole for a nonhomicide offense. *Graham*, 560 US at 52-53. The Court noted that juvenile offenders as a class were less culpable for their offenses than adult offenders:

> [B]ecause juveniles have lessened culpability they are less deserving of the most severe punishments. As compared to adults, juveniles have a lack of maturity and an underdeveloped sense of responsibility; they are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure"; and their characters are not as well formed. These salient characteristics mean that it is difficult even for expert psychologists to differentiate between the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption. Accordingly, juvenile offenders cannot with reliability be classified among the worst offenders. A juvenile is not absolved of responsibility for his actions, but his transgression is not as morally reprehensible as that of an adult. [*Id*. at 68 (quotation marks and citations omitted).]

After considering a variety of factors, the Supreme Court determined that a case-by-case approach that requires courts to consider a juvenile offender's age when determining whether to sentence the juvenile to life without parole was not acceptable; it determined instead that the Eighth

-12-

Amendment required a categorical ban on sentencing juveniles to life without the possibility for parole for a nonhomicide offense. *Id*. at 74. The Court explained that the categorical rule applied to persons who committed the nonhomicide offense before turning 18 years of age:

> This Court now holds that for a juvenile offender who did not commit homicide the Eighth Amendment forbids the sentence of life without parole. This clear line is necessary to prevent the possibility that life without parole sentences will be imposed on juvenile nonhomicide offenders who are not sufficiently culpable to merit that punishment. Because "[t]he age of 18 is the point where society draws the line for many purposes between childhood and adulthood," those who were below that age when the offense was committed may not be sentenced to life without parole for a nonhomicide crime. [*Id*. at 74-75 (citation omitted).]

In *Miller*, the Supreme Court of the United States extended its holding in *Graham* to mandatory sentences of life without the possibility of parole for juvenile offenders who commit homicide offenses. *Miller*, 567 US at 465. The Court explained that a mandatory sentence of life without the possibility of parole violated the Eighth Amendment when applied to a juvenile offender: "By making youth (and all that accompanies it) irrelevant to imposition of that harshest prison sentence, such a scheme poses too great a risk of disproportionate punishment." *Id*. at 479. The Court again stated that its categorical rule applied only to those offenders who committed their offenses before turning 18 years of age. *Id*. at 465.

On appeal, Hassel maintains that the mandatory sentence of life without the possibility of parole violates the prohibition against cruel or unusual punishments because it foreclosed the trial court from considering his youthful status as a 19-year-old offender. As already noted, our Supreme Court has held that the Legislature's decision to require a sentence of life without the possibility of parole for felony murder generally does not violate the prohibition against cruel and unusual punishments. See *Hall*, 396 Mich at 657-658. Hassel, nevertheless, argues that the characteristics that warranted a categorical ban on mandatory sentences of life without the possibility of parole in *Graham* and *Miller* for juvenile offenders apply equally to young adult offenders. However, the Supreme Court of the United States specifically stated in *Miller* that the categorical ban applied only to juvenile offenders who committed their crimes before turning 18 years of age. *Miller*, 567 US at 465. Likewise, in *Graham*, the Court noted that it had previously determined that it needed to draw a line at some point and recognized that 18 years of age was the point where society had drawn the line for many purposes between childhood and adulthood; for that reason, it determined that its ban on life sentences applied only to offenders who were not yet 18 years of age when they committed their offense. See *Graham*, 560 US at 74-75. Because the decisions in *Graham* and *Miller* do not apply to offenders who were 18 years of age or older when they committed felony murder, and our Supreme Court has already held that a mandatory penalty of life without the possibility of parole does not violate the prohibition against cruel and unusual punishments, it cannot be said that the trial court committed a plain or obvious error when it sentenced Hassel to a mandatory sentence of life without the possibility of parole for his conviction of felony murder. See *Carines*, 460 Mich at 763.

Some courts have extended the reasoning of *Graham* and *Miller* to young adult offenders in different contexts. See, e.g., *Cruz v United States*, unpublished per curiam opinion of the United States District Court for the District of Connecticut, issued March 29, 2018 (Docket 11-CV-787);

2018 WL 1541898. But, as the Supreme Court of Illinois has noted, other jurisdictions have rejected attempts to expand *Graham* and *Miller* to adult offenders:

> Finally, we note that claims for extending *Miller* to offenders 18 years of age or older have been repeatedly rejected. See, e.g., *United States v Williston*, 862 F3d 1023, 1039-1040 (CA 10, 2017) (declining to expand the holding of *Miller* to offenders who are " 'just over age 18' " at the time of their offenses); *United States v Marshall*, 736 F3d 492, 500 (CA 6, 2013) (for eighth amendment purposes, an individual's eighteenth birthday marks the bright line separating juveniles from adults). *People v Argeta*, 210 Cal App 4th 1478; 149 Cal Rptr 3d 243, 245-246 (2012) (rejecting argument to extend *Miller* to an offender who was 18 years, 5 months old at the time of his offense). We agree with those decisions and our appellate court that, for sentencing purposes, the age of 18 marks the present line between juveniles and adults. As an 18-year-old, defendant falls on the adult side of that line. Accordingly, defendant's facial challenge to his aggregate sentence under the eighth amendment necessarily fails. [*People v Harris*, 427 Ill Dec 833, 847; 120 NE3d 900 (2018).]

Given the weight of authority declining to extend the reasoning of *Graham* and *Miller* to young adult offenders, the trial court did not plainly err when it sentenced Hassel to life without the possibility of parole. See *Carines*, 460 Mich at 763.

## VI. STANDARD 4 CLAIMS OF ERROR

Hassel also raises several claims of error in a brief that he submitted under Supreme Court Administrative Order No. 2004-6, Standard 4.

### A. FAILURE TO INTERVIEW WILLIAMS

Hassel argues on appeal that defense counsel should have interviewed Williams and that his failure to do so warrants a new trial because Williams may have had information that would be helpful to the defense. To establish his claim of ineffective assistance of counsel, Hassel must show that defense counsel's failure to interview Williams fell below an objective standard of reasonableness under prevailing professional norms and that there is a reasonable probability that, but for his failure to move to interview Williams, the outcome of the proceedings would have been different. See *Gioglio*, 296 Mich App at 22. Hassel does not, however, identify the evidence that Williams might have had or how defense counsel could have used that information to benefit the defense. To the extent that Hassel suggests that defense counsel could have called Williams to testify, he has not shown that Williams would have agreed to testify or that he would have testified favorably to the defense.

Hassel has the burden to establish the factual predicate in support of his claim that defense counsel's failure to interview Williams prejudiced his defense. See *People v Carbin*, 463 Mich 590, 600; 623 NW2d 884 (2001). Hassel has not met that burden. In the absence of any evidence that Williams would have provided testimony or evidence beneficial to the defense, Hassel cannot overcome the presumption that defense counsel's decision was a matter of reasonable trial strategy. See *id*. at 601; see also *People v Davis*, 250 Mich App 357, 369; 649 NW2d 94 (2002).

-14-

## B. DOUBLE JEOPARDY

Hassel also argues that his convictions of felony murder and the predicate felony of armed robbery violate the prohibition against double jeopardy. He did not preserve this claim of error by raising it before the trial court. See *People v Ackah-Essien*, 311 Mich App 13, 30; 874 NW2d 172 (2015). This Court reviews de novo whether a particular sentence violates double jeopardy, see *People v Smith*, 478 Mich 292, 298; 733 NW2d 351 (2007), but reviews unpreserved claims of constitutional error for plain error affecting the defendant's substantial rights, see *Carines*, 460 Mich at 763.

The Double Jeopardy Clauses of the Michigan Constitution, see Const 1963, art 1, § 15, and the Constitution of the United States, see US Const, Am V, both protect a criminal defendant, in relevant part, from multiple punishments for the same offense. See *Smith*, 478 Mich at 299. Michigan courts apply the same elements test to determine whether two offenses constitute the same offense for purposes of applying both clauses. *Id*. at 315-316. Where both offenses have an element that the other does not, the offenses are not the same offenses for purposes of double jeopardy. *Id*. at 296.

Our Supreme Court has held that convicting and sentencing a defendant for felony murder and the underlying predicate felony does not necessarily violate double jeopardy. See *People v Ream*, 481 Mich 223, 242; 750 NW2d 536 (2008). In *Ream*, the trial court sentenced the defendant for both felony murder and the underlying predicate felony of first-degree criminal sexual conduct. *Id*. at 225. In determining whether the defendant could be properly convicted and sentenced for both offenses, our Supreme Court examined the elements of both offenses and recognized that felony murder and first-degree criminal sexual conduct both had elements that the other did not. *Id*. at 241-242. The Court also rejected the contention that first-degree felony murder was necessarily the same offense as the underlying predicate felony. The Court noted that first-degree felony murder is the killing of a human being with malice while committing, attempting to commit, or assisting in the commission of any of several enumerated felonies. *Id*. at 241. Because felony murder could be committed without committing any one enumerated felony, the Court concluded that the defendant's conviction of the predicate felony—first-degree criminal sexual conduct—did not violate double jeopardy. *Id*. at 241-242.

Our Supreme Court has also held that first-degree felony murder was not the same offense as armed robbery—where the armed robbery at issue was not the predicate felony—because both offenses require an element that the other does not require: first-degree murder requires a homicide and a *mens rea* of malice, and armed robbery requires proof that the defendant took property from a victim's presence while armed with a weapon. *Smith*, 478 Mich at 319.

Because armed robbery and felony murder both require proof of an element that the other does not, and felony murder can be committed without committing any one predicate felony, armed robbery and felony murder are not the same offenses for purposes of applying double jeopardy. *Ream*, 481 Mich at 241-242; *Smith*, 478 Mich at 319. Consequently, the trial court did not plainly err when it sentenced Hassel for both his felony-murder conviction and his armed robbery conviction. See *Carines*, 460 Mich at 763.

## C. PROSECUTOR'S REMARKS

Hassel also contends that the prosecutor engaged in misconduct during his closing statements. Hassel first maintains that the prosecutor improperly expressed his belief, in both his opening and closing statements, that Hassel was guilty. Generally, a prosecutor cannot express his or her belief in the defendant's guilt without connecting that belief to the evidence. See *People v Humphreys*, 24 Mich App 411, 414; 180 NW2d 411 (1970).

In this case, the prosecutor used his opening statement to state the facts that he believed would be proved at trial, as he could properly do. See *People v Ericksen*, 288 Mich App 192, 200; 793 NW2d 120 (2010). Throughout his opening statement, the prosecutor described the evidence that he would present. He stated that the jury would see that Hassel possessed the gun used in the shooting in a picture. He stated that the jury would learn that Williams and Hassel still had the pills after the robbery and shooting. And he informed the jury that, "after you hear the evidence, after you see the exhibits, after you hear the testimony, and after you hear his own admissions of what he did about planning this robbery and carrying it out, I'm going to ask you to hold the defendant accountable for his actions." Although the prosecutor sometimes presented his theory as to what the evidence would show as a statement of fact, when his opening statement is read in context, it is evident that the prosecutor tied each assertion to the evidence that he intended to present at trial. See *People v Watson*, 245 Mich App 572, 586; 629 NW2d 411 (2001) (stating that courts must read the prosecutor's comments in context). Therefore, his comments were not improper. See *Humphreys*, 24 Mich App at 414. The same is true for his closing and rebuttal statements.

"The purpose of closing argument is to allow attorneys to comment on the evidence and to argue their theories of the law to the jury." *People v Finley*, 161 Mich App 1, 9; 410 NW2d 282 (1987). In arguing his theories, the prosecutor had leeway to argue the evidence and all reasonable inferences arising from it as they relate to his or her theory of the case. See *People v Bahoda*, 448 Mich 261, 282; 531 NW2d 659 (1995). Once again examining the prosecutor's remarks in context, see *Watson*, 245 Mich App at 586, there is no basis for concluding that the prosecutor asserted that the jury should ignore the evidence and convict merely because the prosecutor asserted his belief that Hassel was guilty. Instead, the record shows that the prosecutor repeatedly emphasized that it was the evidence that demonstrated that Hassel was guilty.

The prosecutor told the jury on several occasions that all the evidence showed that Hassel was guilty. And when the prosecutor made a statement of fact about the events at issue, he connected that statement to the evidence in a way that made it clear that it was his theory that the evidence proved that fact. For example, the prosecutor asserted that "they"—referring to Williams and Hassel—"took those pills." After that assertion, the prosecutor asked: "And how do you know he took those pills?" He then discussed the evidence that the pills were not found at the scene, that an eyewitness placed the pills in either Williams or Hassel's hands just before the shooting, and that Hassel took a picture of himself with a baggie of what appeared to be Xanax pills the following day. Moreover, the only time that the prosecutor stated his belief as to any matter, he stated that he did not believe that the evidence showed that Hassel had enough time to premeditate, and for that reason, he asked the jury to find Hassel guilty of the lesser offense of second-degree murder. Even though he stated a belief that favored Hassel, the prosecutor still correctly connected his belief to the evidence. See *Humphreys*, 24 Mich App at 414. Hassel has not shown that the

prosecutor improperly asked the jury to find guilt on the basis of his belief that Hassel was guilty without connecting his belief to the evidence.

Hassel also argues that the prosecutor argued facts that were not in evidence. Specifically, he maintains that the prosecutor stated that the officers showed Hassel the photos from his phone, that he and Williams took the Xanax pills, and that the gun depicted in the picture was the murder weapon. Although a prosecutor may not argue facts that were unsupported by evidence, see *People v Unger*, 278 Mich App 210, 241; 749 NW2d 272 (2008), he may argue the evidence and all reasonable inferences, see *Bahoda*, 448 Mich at 282. The transcript that Hassel cites shows that the prosecutor did not state that the detectives showed Hassel the pictures from Hassel's phone. Instead, the transcript shows that the prosecutor was referring to Hassel's cross-examination at trial.

Further, as already stated, the prosecutor argued that the evidence showed that the picture of the hand holding a baggie of Xanax bars depicted Hassel with the pills stolen from Conyers. The prosecutor maintained that, even though the jury could not see the person's face, the photo showed that the person was wearing dark jeans with distinctive stitching, which was similar to the dark jeans with distinctive stitching worn by Hassel in the other picture taken at the same time. The prosecutor suggested that that was sufficient for the jury to conclude that it was Hassel and that he was holding the Xanax bars that had been taken from Conyers. There was nothing improper about that argument. See *id*.

The same is true of the prosecutor's claim that the picture of Hassel with the gun showed Hassel with the murder weapon. The prosecutor noted that Hassel admitted to the detectives that he shot Conyers with a two-toned handgun. The prosecution also admitted into evidence a handgun that was shown to have fired the casing found at the scene of Conyers's death and that handgun matched the description of the handgun given by Hassel. Because the picture of Hassel with the gun appeared to depict a similar gun and was taken the day after the shooting, the prosecutor could properly argue that the gun in the picture was the murder weapon. See *id*.

Finally, as already discussed above, the prosecutor could properly attack the credibility of an alibi witness through her failure to come forward with her information earlier. See *Gray*, 466 Mich at 48.

Hassel has not shown that the prosecutor made any improper statements in his opening, closing, or rebuttal statements.

## D. *BRADY* VIOLATION

Hassel next argues that the prosecutor improperly failed to disclose evidence that had been taken from his phone in violation of the rule stated in *Brady v Maryland*, 373 US 83; 83 S Ct 1194; 10 L Ed 2d 215 (1963). To establish a violation of the rule stated in *Brady*, Hassel had the burden to show (1) that the state possessed evidence favorable to him, (2) that he did not possess the evidence and could not obtain it with any reasonable diligence, (3) that the prosecution suppressed the evidence, and (4) that, had the evidence been disclosed, the outcome of the proceedings would have been different. See *People v Cox*, 268 Mich App 440, 448; 709 NW2d 152 (2006).

On appeal, Hassel has not identified the evidence from his phone that the prosecutor purportedly suppressed. He also does not explain how it could be said that he was unaware of any evidence—such as the pictures—that came from his own phone and that he may have taken. Generally, a defendant cannot complain of prejudice occasioned by the failure to disclose evidence that he or she created. See *People v Taylor*, 159 Mich App 468, 488-489; 406 NW2d 859 (1987). He also does not explain how it was that he could not have obtained the evidence with reasonable diligence. Finally, he does not state how the unidentified evidence would have altered the outcome. See *Cox*, 268 Mich App at 448.

Hassel failed to establish that the prosecution violated the rule stated in *Brady*.

## E. INEFFECTIVE ASSISTANCE

Finally, Hassel argues that defense counsel provided ineffective assistance by failing to object to the admission of the photos taken from Hassel's phone and by failing to inform him that officers had the photos. As already discussed, the police officers properly seized the photos under a search warrant. And Hassel has not identified any plausible basis for otherwise precluding the admission of the photos. By failing to discuss any basis for excluding the photos, Hassel has abandoned this claim of error on appeal. See *Martin*, 271 Mich App at 315.

Hassel has likewise abandoned his claim that defense counsel deprived him of a fair trial by failing to inform him that police officers seized the photos that were on his phone. See *id*. Hassel presumably knew that the photos were on his phone and he had to have known that the police officers had access to his phone because the phone was seized when he was arrested in Grand Rapids and officers obtained a search warrant to search it. See *Taylor*, 159 Mich App at 488-489. Moreover, he does not explain how the outcome of his trial would have been different had he known that the police officers had examined the photos from his phone at some earlier point. Consequently, Hassel has not shown that defense counsel's performance fell below an objective standard of reasonableness under prevailing professional norms. See *Gioglio*, 296 Mich App at 19-20.

## VII. CONCLUSION

Hassel has not identified any errors that deprived him of a fair trial or that warrant resentencing.

Affirmed.

/s/ Stephen L. Borrello
/s/ David H. Sawyer
/s/ Deborah A. Servitto