FILED
United States Court of Appeals
Tenth Circuit

June 11, 2024

Christopher M. Wolpert
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

JEFFREY LYN PIERCE,

    Defendant - Appellant.

No. 23-7062
(D.C. No. 6:21-CR-00170-BMJ-1)
(E.D. Okla.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **MORITZ**, **ROSSMAN**, and **FEDERICO**, Circuit Judges.
_____

Defendant Jeffrey Lyn Pierce appeals his conviction for second-degree murder in Indian country, in violation of 18 U.S.C. §§ 1111(a), 1151, and 1152.  Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we affirm.

I

In early 2018, Mr. Pierce, a non-Indian, married Ronnie Fitzpatrick, an enrolled member of the Choctaw Nation of Oklahoma (Choctaw Nation).  Following their

_____

[*] After examining the briefs and appellate record, this panel has determined unanimously to honor the parties' request for a decision on the briefs without oral argument.  *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G).  The case is therefore submitted without oral argument.  This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel.  It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

marriage, the couple lived together on a rural property just outside of Hugo, Oklahoma, that included two houses. It is undisputed that the property lies within the boundaries of the Choctaw Nation's reservation and is considered Indian Country for purposes of the General Crimes Act. *See* 18 U.S.C. § 1152.

In early 2020, Ms. Fitzpatrick[1] befriended Jackie Mills, a Hugo resident. Between February and May of 2020, Ms. Fitzpatrick and Ms. Mills saw each other on a daily basis. According to Ms. Mills, Mr. Pierce and Ms. Fitzpatrick argued frequently and, at some point in early 2020, Ms. Fitzpatrick moved from the couple's bigger house and lived separately from Mr. Pierce in the smaller house located on the same property. Ms. Fitzpatrick also, in February 2020, moved some furniture and other belongings from the couple's bigger house into a storage unit in Hugo that she solely controlled.

On the evening of May 6, 2020, Ms. Fitzpatrick and Ms. Mills ate dinner together at the bigger house on the Pierces' property. Ms. Fitzpatrick made a plate of food for Mr. Pierce and took it from the kitchen into the living room where Mr. Pierce was sitting. Mr. Pierce threw the plate of food back at Ms. Fitzpatrick as she returned to the kitchen. Mr. Pierce then, according to Ms. Mills, "pulled a knife on" Ms. Fitzpatrick. App. vol. I at 218. Ms. Fitzpatrick responded by grabbing a knife and the couple proceeded to argue with each other with the knives in their hands. Ms. Mills was able to persuade the couple to put the knives down. The couple, however,

---

[1] Ms. Fitzpatrick took Mr. Pierce's surname at the time of their marriage. In order to avoid confusion, however, we will refer to her as Ms. Fitzpatrick throughout this decision.

continued to argue and Mr. Pierce placed Ms. Fitzpatrick in a chokehold. Ms. Mills intervened again and Mr. Pierce told Ms. Mills that she "needed to get [Ms. Fitzpatrick] out of there before he killed her." *Id.* at 218. Ms. Mills and Ms. Fitzpatrick left the bigger house and went to Ms. Mills's house. As the two women were leaving, Mr. Pierce threw "a boot or shoes or something out the door at" Ms. Fitzpatrick. *Id.* at 219.

The two women remained at Ms. Mills's house until approximately 9 p.m., when they returned to the bigger house on the Pierces' property. There, they made some margaritas and got in the hot tub. At approximately 2:30 a.m. on May 7, 2020, Ms. Mills left and returned to her own house. Ms. Mills asked Ms. Fitzpatrick to spend the night at Ms. Mills's house, but Ms. Fitzpatrick declined to do so.

According to Ms. Mills, she received several phone calls from Ms. Fitzpatrick later on the morning of May 7, but she missed those calls. Ms. Mills also, at some point that same morning, received a text message from Ms. Fitzpatrick that stated, "Call me ASAP." *Id.* at 221.

In the early afternoon hours of May 7, a Hugo resident named Leonard Fox received a phone call from Mr. Pierce. Mr. Fox had known Mr. Pierce for over forty years and had previously worked for Mr. Pierce at a nightclub in Hugo. According to Mr. Fox, Mr. Pierce "told [him] to call 911, that Ronnie was bleeding from the neck" and that Mr. Pierce had "stabbed her." *Id.*, vol. II at 386. Mr. Fox called 911 and conveyed the information that Mr. Pierce provided to him.

3

Kay Ledet, a paramedic employed by the Choctaw County Ambulance Authority in Hugo, answered the 911 call placed by Mr. Fox and then drove by ambulance to the Pierces' residence. Mr. Pierce was standing in the doorway of the bigger house and, according to Ms. Ledet, several other people were present at the scene. Mr. Pierce told Ms. Ledet that Ms. Fitzpatrick had pulled a gun. He then told Ms. Ledet that Ms. Fitzpatrick also pulled a knife on him and had been threatening him. Ms. Ledet asked Mr. Pierce if Ms. Fitzpatrick was still threatening him, and Mr. Pierce said "no, she's almost dead." *Id.*, vol. I at 172. Mr. Pierce pointed Ms. Ledet in the direction of Ms. Fitzpatrick, who was lying on her right side inside the house. Ms. Ledet turned Ms. Fitzpatrick over and was able to detect a shallow pulse. Ms. Ledet then dragged Ms. Fitzpatrick onto the front porch area of the house so that she did not disturb what she believed was a potential crime scene and also to get away from the large area of blood around Ms. Fitzpatrick's body. Ms. Ledet actively treated Ms. Fitzpatrick for sixteen minutes, to no avail.

Dr. Cheryl Niblo, a forensic pathologist employed by the Office of the Chief Medical Examiner in Tulsa, Oklahoma, performed an autopsy on Ms. Fitzpatrick's body. Dr. Niblo determined that Ms. Fitzpatrick sustained approximately sixty-six sharp-force injuries, the majority of which were incised wounds, on her head, neck, chest, shoulder, left upper back, arms, and hands. Dr. Niblo concluded that one of those injuries, a one-inch stab wound on Ms. Fitzpatrick's neck, hit an external jugular vein and was lethal because it caused a significant amount of blood loss. Dr. Niblo concluded that the cause of death was multiple sharp-force injuries and that the manner

4

of death was homicide.  Lastly, Dr. Niblo noted that Ms. Fitzpatrick tested positive for methamphetamine and Xanax and opined that the methamphetamine was ingested by Ms. Fitzpatrick near the time of her death.

II

On April 15, 2021, a criminal complaint was filed against Mr. Pierce in the United States District Court for the Eastern District of Oklahoma charging him with murder in Indian Country, in violation of 18 U.S.C. §§ 1111(a), 1151, and 1152. Shortly thereafter, a federal grand jury indicted Mr. Pierce on the same charge.  The indictment alleged that Mr. Pierce "willfully, deliberately, maliciously, and with premeditation and malice aforethought, unlawfully kill[ed]" Ms. Fitzpatrick. Suppl. App. at 1.

The case proceeded to a jury trial in May 2022.  The government presented testimony from eight witnesses and rested its case.  Defendant moved for a judgment of acquittal, but the district court denied that motion.  The defense then presented testimony from fifteen witnesses, including Mr. Pierce himself.  The focus of the defense case was on Mr. Pierce's theory of self-defense.  At the conclusion of all the evidence, the defense again moved for a judgment of acquittal, but the district court again denied the motion.  The jury found Mr. Pierce not guilty of first-degree murder, but guilty of second-degree murder.

The district court sentenced Mr. Pierce to 327 months' imprisonment, to be followed by a three-year term of supervised release.

Mr. Pierce now appeals.

III

Mr. Pierce raises four issues on appeal.  In his first two issues, he challenges evidentiary rulings made by the district court during trial.  In his third issue, he argues that the district court erred by failing to sua sponte instruct the jury on the theory of imperfect self-defense and the lesser-included offense of involuntary manslaughter.  In his final issue on appeal, Mr. Pierce argues that the district court erred in denying his motion for judgment of acquittal.  For the reasons outlined below, we conclude that all of these issues lack merit.

A

Shortly after Ms. Fitzpatrick's death, Chad Dansby, a special agent with the Oklahoma State Bureau of Investigation (OSBI), arrived at Mr. Pierce's residence and interviewed him.  At trial, the government presented Agent Dansby as a witness and asked him, in relevant part, "what, if anything, did the defendant say about who stabbed and killed [Ms. Fitzpatrick]?"  App., vol. I at 185.  Agent Dansby replied: "He told me that he did.  And that he had—wasn't sure how many times, but he thought it was about maybe around four."  *Id.*

On cross-examination, defense counsel asked Agent Dansby a series of follow-up questions about his interview with Mr. Pierce.  In particular, defense counsel asked Agent Dansby if Mr. Pierce told him "about taking out a protective order against" Ms. Fitzpatrick.  *Id.* at 188.  Government counsel objected to the question, noting Mr. Pierce filed "an application for a protective order," but that the application "actually was never granted by the Court" and "was dismissed . . . because both parties

didn't show up." *Id.* at 189.  Government counsel also argued that the application for protective order should not be admitted because it "contain[ed] a bunch of the defendant's allegations that ha[d] not been validated by the Court." *Id.*  During the ensuing colloquy, defense counsel stated that "Mr. Pierce [wa]s likely to testify" in his own defense, "in which case" his allegations in the application for a protective order "w[ould] then become relevant." *Id.* at 190.  Defense counsel then stated, "I would like to make sure that [Agent Dansby] was told about it.  If not, we can call him back.  It was going to be two questions just to set the stage." *Id.*  The district court responded, "Well, I think you ought to call [Agent Dansby] back," and in turn sustained the objection to the question.  *Id.*

On appeal, Mr. Pierce argues that the district court violated "the completeness doctrine" by limiting defense counsel's cross-examination of Agent Dansby regarding his interview with Mr. Pierce.  Aplt. Br. at 13.  Mr. Pierce notes that "[t]his is a self defense case," and he argues that "[t]o allow the government to introduce evidence that [he] stabbed the victim and not allow him to explain why he stabbed her is distortion at the highest level." *Id.* at 17.

We review the district court's evidentiary rulings for abuse of discretion. *United States v. Hay*, 95 F.4th 1304, 1318 (10th Cir. 2024).  That means "we do not reverse absent a distinct showing that the district court ruled based on a clearly erroneous finding of fact or conclusion of law or manifested a clear error of judgment." *United States v. Williston*, 862 F.3d 1023, 1038 (10th Cir. 2017).

7

"The rule of completeness . . . began as a common-law rule and is now partially codified in [Federal Rule of Evidence] 106 . . . ." *Id.* At the time of the trial in this case, Rule 106 provided that "[i]f a party introduces all or part of a writing or recorded statement, an adverse party may require the introduction, at that time of any other part—or any other writing or recorded statement—that in fairness ought to be considered at the same time."[2] Fed. R. Evid. 106 (2022). We consider four factors in determining whether proffered evidence should be admitted under the rule of completeness. *Williston*, 862 F.3d at 1038. Those factors include whether the proffered evidence: "(1) explains the admitted evidence, (2) puts the admitted evidence in context, (3) does not itself mislead the jury, and (4) ensures that the jury can fairly and impartially understand the evidence." *Id.* at 1038–39. Under the rule of completeness, otherwise inadmissible statements may be admitted to provide necessary context for other statements already properly admitted. *United States v. Lopez-Medina*, 596 F.3d 716, 735–36 (10th Cir. 2010).

We conclude that the district court did not abuse its discretion in limiting defense counsel's cross-examination of Agent Dansby. Although Agent Dansby testified that Mr. Pierce told him he stabbed Ms. Fitzpatrick, that fact was not in dispute and thus Agent Dansby's testimony did not mislead the jury. Moreover, the testimony that defense counsel sought to elicit from Agent Dansby regarding Mr. Pierce seeking

---

[2] Rule 106 was amended in 2023 to expressly include oral statements.

8

a protective order against Ms. Fitzpatrick was unnecessary to place Agent Dansby's testimony on direct examination into context for the jury.

Even assuming, for purposes of argument, that the district court abused its discretion in limiting defense counsel's cross-examination of Agent Dansby regarding his interview with Mr. Pierce, we conclude the error was harmless. *See generally United States v. Walker*, 85 F.4th 973, 982 (10th Cir. 2023) (noting that if a party objects to a district court's evidentiary ruling based only on the Federal Rules of Evidence, we review for non-constitutional harmless error). That is because later in the trial the defense recalled Agent Dansby as a witness and questioned him about what else Mr. Pierce told him during his investigative interview. Agent Dansby testified in response that Mr. Pierce stated that he and Ms. Fitzpatrick argued on the morning of her death and that she "went and got a gun out of the car . . . and . . . waved it around and pointed it at him." App., vol. V at 1003. Agent Dansby further testified that Mr. Pierce stated that shortly thereafter, Ms. Fitzpatrick initiated a deadly confrontation with him by grabbing a knife from the kitchen and stabbing at his "wrist or arm or something." *Id.* at 1007. According to Agent Dansby, Mr. Pierce stated that he and Ms. Fitzpatrick then engaged in a lengthy struggle with each other, during which "[t]hey fell to the floor." *Id.*

The defense also presented a variety of testimony regarding Mr. Pierce's attempt to obtain a protective order against Ms. Fitzpatrick. To begin with, Mr. Pierce testified at length about his volatile relationship with Ms. Fitzpatrick, including multiple instances in which she allegedly physically attacked him or threatened him with

violence, and about how he became frightened of Ms. Fitzpatrick and briefly moved out on two occasions due to his fear of her. With the district court's permission, defense counsel asked Mr. Pierce if he "sw[ore] out a protective order against" Ms. Fitzpatrick. *Id.*, vol. III at 493. Mr. Pierce stated that he did, but that he failed to follow up on it and go to court and, as a result, a protective order was never issued against her. During the redirect examination of Mr. Pierce, the district court permitted defense counsel to question Mr. Pierce about the application for protective order that he filed against Ms. Fitzpatrick. Mr. Pierce testified that the application was dated February 29, 2020, and he described what he alleged in the application. Specifically, Mr. Pierce testified that he stated in the application that Ms. Fitzpatrick twice hit him across his face, stabbed at him eleven times while he was lying in bed and caused him to sustain a small cut, threatened him with a gun on one occasion, and, approximately ten days prior to the filing of the application, pulled a knife on him and cut his thumb. Dr. Victoria Pardue, Mr. Pierce's family physician, testified that during an office visit in early April 2020, Mr. Pierce told her that Ms. Fitzpatrick had been physically abusive to him and that he had sought a protective order against her. Lastly, Terry Park, the Sheriff of Choctaw County, Oklahoma, testified that he had served a protective order application on Ms. Fitzpatrick.

In light of all this evidence, we conclude the jury was in no way misled by the admission of Agent Dansby's testimony during the government's case-in-chief nor the limitations on cross-examination during his first round of testimony. Rather, the jury, at the time of its deliberation, was fully aware of what Mr. Pierce told Agent Dansby

10

during his interview, and, more generally, of his claim that he acted in self-defense when he killed Ms. Fitzpatrick.

B

In his second issue on appeal, Mr. Pierce argues that the district court erred in refusing to allow him to testify that he "suffers from the beginning of dementia." Aplt. Br. at 13. Alternatively, Mr. Pierce argues that the district court erred by failing to sua sponte order him to undergo a competency examination.

To properly address these arguments, we begin by reviewing in some detail the relevant portions of the trial proceedings. Mr. Pierce testified in his own defense. Near the outset of his testimony, defense counsel stated to Mr. Pierce: "I'm going to ask you some questions about your health conditions now, in 2022, and I'm going to talk to you about your health conditions at the time that [Ms. Fitzpatrick] died, okay?" App., vol. III at 416. When defense counsel began to question Mr. Pierce about his current health conditions, the government objected and argued that any discussion of his current health conditions was "just a way to garner support" from the jury. *Id.* at 417. Defense counsel responded: "Well, the jury is going to be deciding his credibility and I think the fact that he's got some issues with respect to not being able to sleep and some beginnings of dementia, which he's noticed and family members have noticed, is very relevant to their consideration of his testimony and the cross-examination." *Id.* Defense counsel further stated: "He's competent and that's not an issue, but whether or not he has health issues which are going to affect his testimony I think is perfectly relevant for the jury to consider." *Id.* The district court then asked defense counsel:

11

"So the health issues are going to affect his testimony, does not that speak then to competency? Does that not trigger a competency inquiry?" *Id.* at 417–18. Defense counsel responded, "No. Competency is basically a very, very low standard that says that he can't understand or appreciate the nature of the case and that he cannot communicate with his lawyers. He can do both of those." *Id.* at 418. The district court ruled that it would "not . . . allow the discussion as to present challenges," but would allow "those that were existing, then existing at the time of the crime." *Id.* Consistent with the district court's ruling, defense counsel questioned Mr. Pierce about his "health issues in May of 2020." *Id.* at 419. Mr. Pierce testified that he suffered from a number of physical ailments, including diabetes, recovery from gallbladder surgeries, a liver infection, arthritis, numbness in his feet, overall weakness in his body, balance issues, and cataracts.

Later during Mr. Pierce's direct examination, the district court and the parties had a sidebar to discuss, in relevant part, the government's objection that defense counsel was "leading the witness." *Id.* at 497. In the course of discussing that issue, defense counsel stated:

> Your Honor, I will just say for the record that the reason I wanted to go into what's been going on with [Mr. Pierce] is the beginning stages of dementia. Our expert said he is competent, but he is in the beginning stages of dementia and I think we clearly see it. But I don't think I need to go into it because I think the jury sees it, too. Everybody's got a grandpa.

*Id.* at 498–99.

During the remainder of his testimony, Mr. Pierce twice stated, without prompting from defense counsel, that he was having memory issues. In one instance, Mr. Pierce, in responding to the question of why he returned to live with Ms. Fitzpatrick after she had allegedly physically abused him, stated: "She told me she would always take care of me when I got old, and I was getting there, working on it pretty steady. My mind is—I kind of got dementia, a little bit of dementia, because I can't remember where I'm going sometimes—." *Id.* at 507. The prosecution objected to this testimony. The district court sustained the objection and instructed the jury to "disregard that last statement." *Id.* Later, during redirect, Mr. Pierce stated that he did not remember if Ms. Fitzpatrick said anything to him as they fell to the floor prior to her death. When asked by defense counsel "Why do you think you wouldn't remember?," Mr. Pierce responded: "I can't remember hardly anything anymore. I'm just getting old." *Id.*, vol. IV at 695. Mr. Pierce's statement was not stricken from the record.

Mr. Pierce now argues on appeal that "testimony regarding the beginnings of [his] dementia [was] relevant and should have been admitted." Aplt. Br. at 21. Mr. Pierce argues in support that his "troubles testifying within the limitations as set out in a courtroom . . . were because of the onset of dementia." *Id.* at 22. Mr. Pierce further argues that "[h]is credibility/believability [wa]s of paramount importance" and "[f]or the jury to know that his rambling testimony and some misrecollections [we]re due to a health condition [wa]s vitally important in assessing his credibility." *Id.* "To exclude this evidence of dementia," Mr. Pierce argues, "is unfair prejudice." *Id.* at 23.

13

As noted, we review the district court's evidentiary rulings for abuse of discretion. *Hay*, 95 F.4th at 1318. "Relevant evidence is [generally] admissible," whereas "[i]rrelevant evidence is not admissible." Fed. R. Evid. 402. Evidence is considered relevant if "(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401. Even if evidence is relevant, it may be excluded "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.

We assume, as does the government, that Mr. Pierce's alleged memory issues were relevant under Rule 401 for purposes of the jury evaluating the reliability of his testimony or his credibility. We therefore focus on whether the district court abused its discretion in excluding the evidence under Rule 403.[3]

---

[3] At trial, the government's objection to the dementia evidence was to relevance and did not mention Rule 403. Likewise, the district court did not expressly refer to Rule 403 in excluding Mr. Pierce's testimony regarding his alleged dementia. But the district court did state on the record that Mr. Pierce's testimony would "invite . . . sympathy, which we're not going to allow," App. vol. III at 417, and would also "draw unnecessary attention" to this evidence by the jury. *Id.* at 420. Although we can conduct a de novo balancing when a district court does not make explicit Rule 403 findings, *United States v. McVeigh*, 153 F.3d 1166, 1189 (10th Cir. 1998), we review for abuse of discretion here because we conclude the district court "must have implicitly made a Rule 403" ruling when it considered and sustained the government's objections to that testimony. *United States v. Lazcano-Villalobos*, 175 F.3d 838, 847 (10th Cir. 1999).

Although Mr. Pierce's defense counsel made reference during trial to a defense expert opining that Mr. Pierce was "in the beginning stages of dementia," the defense did not present that expert as a witness at trial. App., vol. III at 499. "[A] lay witness," such as Mr. Pierce, "cannot testify to 'scientific, technical, or other specialized knowledge.'" *United States v. Torres-Correa*, 23 F.4th 129, 136 (10th Cir. 2022) (quoting Fed. R. Evid. 701(c)). Instead, "an opinion based on scientific . . . knowledge," including testimony about a witness's mental health, "may only be given by '[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education.'" *Id.* (quoting Fed. R. Evid. 702). Without the testimony of a qualified witness discussing how Mr. Pierce's early dementia could affect his ability to recall events, the jury would have been left to speculate about the relevance and probative value of Mr. Pierce's own statements regarding his dementia.[4] We therefore conclude that, under Rule 403, the probative value of Mr. Pierce's proffered testimony regarding his alleged dementia diagnosis would have been substantially outweighed by the danger of confusing the issues or misleading the jury. As a result, we conclude the district court did not abuse its discretion in prohibiting Mr. Pierce from testifying that he was suffering from the beginning stages of dementia. *Id.*; *see also United States v. Jones*, 213 F.3d 1253, 1261 (10th Cir. 2000) (concluding district court did not abuse its discretion in refusing to allow cross-examination of key prosecution witness

---

[4] Indeed, Mr. Pierce does not clarify in his appellate brief how his testimony regarding his alleged dementia diagnosis could have affected his ability to recall events relevant to the issues at trial.

regarding his history of mental illness because no expert testimony was presented establishing how the witness's history of mental illness "could significantly affect perception or recollection").

That leaves Mr. Pierce's alternative argument that the district court erred by failing to sua sponte order a competency examination of him.  The government argues in response that Mr. Pierce has waived this argument by failing to adequately brief it.[5] In his brief, Mr. Pierce failed to develop this cursory argument and did not include any citations to legal authorities to support his position.  As such, we agree with the government that he waived this argument on appeal.  *See* Fed. R. App. P. 28(a)(8)(A); *Sawyers v. Norton*, 962 F.3d 1270, 1286 (10th Cir. 2020) ("[A]rguments that are inadequately presented in an opening brief" or "presented only in a perfunctory manner" are "abandoned or waived" (brackets and internal quotation marks omitted)); *United States v. Cooper*, 654 F.3d 1104, 1128 (10th Cir. 2011) ("It is well-settled that arguments inadequately briefed in the opening brief are waived." (alterations and quotations omitted)).

C

In his third issue, Mr. Pierce argues that the district court erred by failing to sua sponte instruct the jury on the theory of imperfect self-defense and the lesser-included offense of involuntary manslaughter.  Because Mr. Pierce did not request either of these instructions during the district court proceedings, our review is, at most, only for

---

[5] Mr. Pierce makes no mention of the issue in his appellate reply brief.

plain error.[6]  *Sago*, 74 F.4th at 1157.  To prevail under this standard, Mr. Pierce "must demonstrate (1) error, (2) that is plain, which (3) affects substantial rights, and which (4) seriously affects the fairness, integrity, or public reputation of judicial proceedings."  *Id.* at 1157–58 (internal quotation marks omitted)).

It is well established that "a defendant is entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor."  *Mathews v. United States*, 485 U.S. 58, 63 (1988).  Here, Mr. Pierce asserted, and the district court instructed the jury on, a theory of self-defense.  "A person may resort to self-defense if he reasonably believes that he is in imminent danger of death or great bodily harm, thus necessitating an in-kind response."  *United States v. Britt*, 79 F.4th 1280, 1286 (10th Cir. 2023) (quoting *United States v. Toledo*, 739 F.3d 562, 567 (10th Cir. 2014)).  Self-defense negates the malice element of first-degree murder by showing the defendant had a justification for killing the victim.  *United States v. Kepler*, 74 F.4th 1292, 1313 (10th Cir. 2023).

"Closely related to self-defense, which we sometimes refer to as perfect self-defense, is the defense of imperfect self-defense."  *Britt*, 79 F.4th at 1286.  Both of these defenses require the defendant to "possess the subjective belief that deadly force was necessary to prevent death or great bodily harm."  *Id.* (quoting *United States v. Craine*, 995 F.3d 1139, 1156 (10th Cir. 2021)).  The key distinction between the two

---

[6] In *United States v. Sago*, 74 F.4th 1152, 1162 (10th Cir. 2023), we suggested that "the decision to conduct plain-error review" in these circumstances could "be treated as dictum."  Out of an abundance of caution, however, we shall apply plain error review in this case.

defenses is "the reasonableness of the defendant's [subjective] belief that deadly force was necessary to prevent death or great bodily harm." *Id.* (quoting *Toledo*, 739 F.3d at 569). If the defendant's subjective belief was objectively reasonable, "he has a complete defense and is entitled to a self-defense acquittal." *Id.* (internal quotation marks omitted). But if the defendant's subjective belief was not objectively reasonable—in other words, if the factfinder determines the defendant was criminally negligent in his subjective belief—"he is not entitled to a complete acquittal, but rather is guilty of involuntary manslaughter." *Id.* at 1287 (internal quotation marks omitted).

Importantly, a defendant cannot proceed on a theory of imperfect self-defense without the jury being instructed on the lesser-included offense of involuntary manslaughter. That is because, as we noted in *Sago*, "it would be intolerable to instruct a jury that a mitigation affirmative defense (such as imperfect self-defense) would establish innocence of the charged offense while failing to instruct the jury that the mitigating circumstances only reduce culpability to that of a lesser-included offense." 74 F.4th at 1160. Given our repeated holding "that a defendant is not entitled to a lesser-included-offense instruction unless the instruction has been requested at trial," a defendant seeking to proceed on a theory of imperfect self-defense must request an involuntary manslaughter instruction. *Id.* at 1161 (citing cases).

Here, it is undisputed that Mr. Pierce did not ask the district court to instruct the jury on the theory of imperfect self-defense or the lesser-included offense of involuntary manslaughter. The district court was therefore under no obligation to

18

sua sponte provide those instructions to the jury. As a result, Mr. Pierce's claim of error fails at the first prong of the plain error test.

D

In his final issue, Mr. Pierce argues that the district court erred in denying his motion for judgment of acquittal. We review de novo the sufficiency of the evidence to support a conviction or the denial of a defendant's motion for judgment of acquittal. *United States v. Walker*, 74 F.4th 1163, 1190 (10th Cir. 2023). "This review is highly deferential, meaning we consider the evidence and make reasonable inferences in the light most favorable to the Government." *Id.* (internal quotation marks omitted). We will reverse a conviction only if no rational trier of fact could have found the essential elements of the crime of conviction beyond a reasonable doubt. *Id.*

The jury in this case found Mr. Pierce guilty of the lesser-included offense of second-degree murder. To find Mr. Pierce guilty of that crime, the jury had to find beyond a reasonable doubt that (1) Mr. Pierce caused the death of Ms. Fitzpatrick, (2) Mr. Pierce killed Ms. Fitzpatrick with malice aforethought (meaning either that he killed her deliberately and intentionally, or acted with callous and wanton disregard for human life), and (3) the killing took place in Indian Country. *See Sago*, 74 F.4th at 1156; *see* 18 U.S.C. §§ 1111(a), 1152.

Mr. Pierce disputes only the second element, i.e., whether the evidence was sufficient to allow the jury to find beyond a reasonable doubt that he killed Ms. Fitzpatrick with malice aforethought. In particular, he argues that the government failed to prove beyond a reasonable doubt that he did not act in self-defense. As we

19

have noted, self-defense negates the element of malice by showing the defendant had a justification for killing the victim. *Kepler*, 74 F.4th at 1313.

We reject Mr. Pierce's argument. Mr. Pierce admitted to killing Ms. Fitzpatrick by stabbing her with a knife. Although Mr. Pierce told Agent Dansby immediately after the killing that he recalled stabbing Ms. Fitzpatrick four times, the medical examiner determined that Ms. Fitzpatrick sustained sixty-six separate sharp-force injuries all over her upper body, including slash wounds to her face, stab wounds on both sides of her neck and under her chin, and the fatal stab wound to her jugular vein. The medical examiner also determined that Ms. Fitzpatrick sustained multiple blunt force injuries to her head, chin, neck, and shoulder, most or all of which were inconsistent with Mr. Pierce's description of the events leading to her death. Further, although Mr. Pierce presented evidence intended to show that his age and various physical ailments had reduced his physical capabilities, the jury could have reasonably found that any such decrease in Mr. Pierce's physical capabilities was offset by the substantial size advantage he had over Ms. Fitzpatrick. Mr. Pierce is 6' 2" tall and weighs 210 pounds, whereas Ms. Fitzpatrick was 5' 1" tall and weighed 115 pounds. Notably, the OSBI crime scene investigator testified that there appeared to be more blood stains on the inside inner legs of Mr. Pierce's jeans than on the outsides of the jeans, suggesting that Mr. Pierce may have straddled Ms. Fitzpatrick's body while he inflicted some or all of the sharp-force wounds. In sum, we conclude that the jury could have reasonably found that the injuries Mr. Pierce inflicted on Ms. Fitzpatrick

were neither proportional to the threat he allegedly faced from her nor necessary for his self-defense.

IV

We AFFIRM Mr. Pierce's conviction for second-degree murder.

Entered for the Court

Richard E.N. Federico
Circuit Judge